*In re* PROCEDURE AND FORMAT FOR FILING TARIFFS UNDER
THE MICHIGAN TELECOMMUNICATIONS ACT

Docket Nos. 163404, 163594, 163942. Submitted February 7, 1995, at
Lansing. Decided May 12, 1995, at 9:40 A.M.

The Public Service Commission, on its own motion, issued an
order initiating a proceeding to establish the procedure and
format for filing tariffs under the Michigan Telecommunica-
tions Act (Act 179), 1991 PA 179, MCL 484.2101 *et seq.*; MSA
22.1469(101) *et seq.*, effective January 1, 1992, to January 1,
1996. The commission deemed it necessary to determine which
services were subject to regulation under Act 179 and thus
were subject to tariff filings. The commission ordered its staff to
prepare a list of regulated services. The commission adopted
most of the the staff's list in an opinion and order from which
several providers of telecommunications services that were
classified as regulated appealed. The providers' appeals were
consolidated by the Court of Appeals.

The Court of Appeals *held:*

1. The Public Service Commission had authority to enter an
order determining which telecommunications services are sub-
ject to regulation under Act 179. The Legislature, in MCL
484.2202(c); MSA 22.1469(202)(c), clearly authorized the com-
mission to require, by order, that providers of regulated ser-
vices file tariffs; in order for the commission to implement that
requirement, it was necessary for the commission to identify
which services are subject to regulation under Act 179. Given
the large number of telecommunications services and the lim-
ited period during which Act 179 is effective, the Legislature
could not have intended that hearings be held to determine
which services are subject to regulation. Section 202(c) did not
limit the commission to prescribing the procedure and format
for tariff filings.

2. The commission's definition of "basic local exchange ser-
vice" as local services that are primarily provided only by local
exchange companies and that are essential to the public health,
safety, or general welfare of most customers is too expansive
and is inconsistent with MCL 484.2102(b); MSA 22.1469(102)(b),
which defines "basic local exchange service" as the provision of
an access line and usage within a local calling area for the

transmission of high-quality two-way interactive switched voice or data communication.

3. The commission's definition of "toll service" as any switched communication between local calling areas that is not provided over a dedicated access line is not meaningfully different from the definition provided in MCL 484.2102(u); MSA 22.1469(102)(u). However, the commission misconstrued the exclusion of individually negotiated contracts for similar telecommunications services or wide area telecommunications services from "toll service," as provided in the second sentence of § 102(u). The commission erred in concluding that individually negotiated contracts for similar telecommunications services could not include regular toll service and were limited to unique services or circumstances not otherwise available in other areas of a provider's tariffs.

4. The commission's definition of "access services," a term not defined in Act 179, as services and facilities provided to enable all providers and customers to originate or terminate any intrastate telecommunication is overly broad and inconsistent with MCL 484.2102(a); MSA 22.1469(102)(a), which defines "access" as the provision of access to a local exchange network for the purpose of enabling a provider to originate or terminate telecommunications service within the exchange.

5. The commission misconstrued MCL 484.2102(r); MSA 22.1469(202)(r) in determining that all local private lines come within the definition of "special access" and are subject to regulation. Section 202(r) defines "special access" as the provision of access, other than switched access, to a local exchange network for the purpose of enabling a provider to originate or terminate telecommunications service within the exchange, including the use of local private lines. It is clear that local private lines could constitute special access only where the provision of nonswitched access to a local exchange network is involved.

6. Arguments raised in the Court of Appeals concerning the commission's pronouncements about "new telecommunication services" are hypothetical or speculative and therefore need not be considered.

Order vacated, except for filing procedures set forth in Attachment A, and case remanded for further consideration.

*Timothy A. Hoffman* and *Loomis, Ewert, Ederer, Parsley, Davis & Gotting, P.C.* (by *William D. Parsley, Harvey J. Messing,* and *Gary L. Field*), for Telephone Association of Michigan.

*Honigman Miller Schwartz & Cohn* (by *James A. Ault) Michael A. Holmes, Craig A. Anderson,* and *Amy Edwards Clark,* for Michigan Bell Telephone Company.

*Larry Salustro, Robin P. Charleston,* and *Fischer, Franklin, Ford, Simon & Hogg* (by *George Hogg, Jr.*) and *Sidney M. Berman,* for AT&T Communications of Michigan, Inc.

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, and *Don L. Keskey* and *Tonatzin M. Alfaro Garcia,* Assistant Attorneys General, for the Public Service Commission.

*Foster, Swift, Collins & Smith, P.C.* (by *Stephen O. Schultz* and *Glen A. Schmiege*), for Michigan Exchange Carriers Association, Inc.

Before: FITZGERALD, P.J., and TAYLOR and MARKMAN, JJ.

TAYLOR, J. These appeals involve a December 22, 1992, decision of the Michigan Public Service Commission determining, among other things, that at least 189 of 445 local telecommunications services are regulated under the Michigan Telecommunications Act (Act 179), 1991 PA 179, MCL 484.2101 *et seq.*; MSA 22.1469(101) *et seq.,* effective January 1, 1992. This act marked a dramatic change in the regulation of telecommunications services in Michigan. It replaced the telephone act, 1913 PA 206, MCL 484.101 *et seq.*; MSA 22.1441 *et seq.* MCL 484.2603; MSA 22.1469(603). In this proceeding, the PSC determined whether several hundred telecommunications services were or were not regulated under Act 179. Appellants are providers of various types of telecommunications services that the PSC found to be regulated.

Act 179 is deregulatory in nature. This is evi-

denced by the fact that the PSC has determined that only 189 out of 445 previously regulated local services continued to be regulated under Act 179. Act 179 is divided into six articles. Article 1 is largely a definitional section. Article 2 relates to the PSC's authority to administer the act. The PSC is given "jurisdiction and authority to administer" the act, but that authority is expressly "limited to the powers and duties prescribed" by the act. MCL 484.2201; MSA 22.1469(201). Specific authority for this Court to review orders of the PSC under the act is provided in § 203(5). The act incorporates the provisions of MCL 462.26; MSA 22.45 for judicial review of PSC decisions.

Article 3 governs regulation of six specific telecommunication services (A-F). The appeals before us particularly concern the first three of these services: basic local exchange service, §§ 301-309a; access service, §§ 310-311; and toll service, § 312. The act permits providers of these services to set the initial rates to be charged when the act goes into effect, but those rates cannot exceed the rate that existed for the same service when the act took effect. Sections 304(2), 310(2), and 312(2). For access service and toll service, the act expressly prohibits the PSC from reviewing or setting rates except as prescribed in specific sections of the act. Sections 310(1) and 312(1).

Article 4 of the act is the deregulatory core of the legislation. Regulation of any telecommunications service not specifically provided for in the act is prohibited. Section 401(2). Article 5 gives the PSC some control over harmful content and article 6 provides for penalties.

Act 179 replaced a regulatory scheme that had developed over many decades. While Act 179 is indicative of an effort to deregulate the telecommunications industry in Michigan, the act clearly

did not eliminate all regulation of telecommunications services. The transition from the old regulatory scheme to the new one is reflected in the provisions continuing rates in effect on December 31, 1991, and precluding rates greater than those in effect on that date. Sections 304(2), 310(2), 310(3), and 312(2).

Acting pursuant to § 202(c), the PSC initiated the instant case by issuing an "Order and Notice of Opportunity to Comment" on February 12, 1992. Section 202(c) provides authority for the PSC to require telecommunications providers to file a schedule of their rates. Section 202(c) states:

> Require by order that a provider of a regulated service, including access, make available for public inspection and file with the commission a schedule of the provider's rates, services and conditions of service, including access provided by contract. [MCL 484.2202(c); MSA 22.1469(202)(c).]

The February 12 order discussed proposed filing procedures and formats, as well as the scope of the services that the PSC could regulate. Many interested parties who responded questioned the PSC's authority under Act 179 to determine which services were regulated as opposed to merely performing the ministerial act of defining the content and physical format of rate schedules or tariffs.

On May 21, 1992, the PSC entered an order requiring its staff to compile a list of regulated telecommunications services. This task was to be done with the aid of interested industry representatives. The staff's report was filed on July 2, 1992. Attached to the report were three lengthy tables identifying hundreds of services as being either regulated or unregulated in the staff's opinion. Comments on this report were filed by interested parties.

On December 22, 1992, the PSC issued an opinion and order requiring providers of regulated telecommunications services to file tariffs. The regulated services were identified in tables similar to the ones attached to the staff's July 2, 1992, report. The PSC did not accept all of its staff's recommendations. The PSC did not attempt to discuss every service listed in the tables, although it did discuss several specific services in the course of its opinion. The effect of the December 22 opinion and order was to identify telecommunications services that the PSC deemed regulated under Act 179 and to leave service providers at their peril if they did not comply with regulatory requirements pertaining to those services.

The appeals at bar challenge the PSC's reasoning with respect to which types of services constitute basic local exchange services, access services, and toll services, as well as which services constitute "new" telecommunications services under MCL 484.2206; MSA 22.1469(206). Appellants have the burden of showing by clear and convincing evidence that the PSC's order is unlawful or unreasonable. MCL 484.2203(5); MSA 22.1469(203)(5); MCL 462.26(8); MSA 22.45(8).

Generally, this Court gives considerable deference to the PSC's administrative expertise and will not substitute its judgment for that of the PSC. *In re Quality of Service Standards for Regulated Telecommunication Services,* 204 Mich App 607, 611-612; 516 NW2d 142 (1994); *CMS Energy Corp v Attorney General,* 190 Mich App 220, 228; 475 NW2d 451 (1991). Such deference, however, is given mostly to longstanding administrative interpretations by the PSC. 204 Mich App 612. Here we are dealing with one of the PSC's initial interpretations of new legislation. While we cannot ignore the PSC's interpretation of Act 179, and it is still

entitled to some deference by virtue of the PSC's institutional position, that interpretation is not entitled to the same measure of deference that we would give to a longstanding administrative interpretation.

The PSC's authority must be plainly granted by the Legislature. The PSC is a creature of the Legislature, and the entirety of the PSC's authority must be found in statutory enactments. *Union Carbide Corp v Public Service Comm,* 431 Mich 135, 146; 428 NW2d 322 (1988); *CMS Energy Corp, supra* at 228. A statute that grants power to an administrative agency must be strictly construed and the administrative authority drawn from such statute must be granted plainly, because doubtful power does not exist. *Mason Co Civic Research Council v Mason Co,* 343 Mich 313, 326-327; 72 NW2d 292 (1955); *Taylor v Public Utilities Comm,* 217 Mich 400, 402-403; 186 NW 485 (1922); *In re Quality of Service Standards, supra* at 611.

I

Before reaching the arguments about the PSC's interpretation of the act, we first address the argument that the PSC was without authority to enter an order determining what telecommunications services are and are not regulated. The position of several appellants is that the PSC was only granted the authority to determine the procedure and format for filing tariffs, something that effectively can be done without identifying every regulated service.

The PSC addressed this argument in its December 22, 1992, decision by finding it "appropriate" to resolve the question of which services are regulated at that time, noting that providers were free not to file tariffs on unregulated services and that

the PSC's findings would merely serve as a "guide" for determining which services required tariff filings under Act 179.

For authority, the PSC relies upon § 202(c), its general grant of authority to administer the act in § 201(1), and a need to identify regulated services in order to carry out its statutory obligations under various other sections such as § 208 (authority to deregulate a service) and § 304 (authority to approve alterations in local exchange rates).

We conclude that the Legislature clearly authorized the PSC to require providers of regulated services to file tariffs, § 202(c), and that, in order to do so, it was necessary for the PSC to identify which services are regulated under Act 179. The PSC has the inherent power necessary to carry out its express duties. *In re Quality of Service Standards, supra* at 613.

Section 202 of the act requires the PSC to do several things without a hearing. In § 202(c) the Legislature directed the PSC to require "by order" that providers of regulated telecommunications services file a schedule of their rates with the PSC. Such filings are understandably necessary in light of the transition to a new regulatory scheme under which some previously regulated services continue to be regulated and some do not.

Requiring providers of regulated services to file tariffs merely on the basis of an order, rather than a contested case to determine whether the services are regulated, is reasonable in light of the transitional nature of the filing requirement provided in § 202(c). Nothing that previously was unregulated can become regulated under § 202(c). In fact, fewer than half of the previously regulated services were found by the PSC to still be regulated under Act 179.

Appellants argue that the PSC's determination of which services are regulated essentially consti- tuted rule making and required at least a hearing that would allow for presentation of evidence and a reviewable determination for each service consid- ered. In light of the hundreds of services involved, and the cost and time required for such a formal undertaking, we cannot attribute such an intent to the Legislature. This is particularly so in light of the fact that Act 179 contains a sunset provision repealing the act on January 1, 1996. MCL 484.2604; MSA 22.1469(604). The process suggested by appellants could not be completed before the act expires and would, in the interim, leave unde- termined the regulation of virtually every telecom- munications service. In construing a statute, ab- surd or unreasonable results are to be avoided wherever possible. *Dep't of Civil Rights v Beznos Corp*, 421 Mich 110, 120; 365 NW2d 82 (1984); *Dafter Sanitary Landfill v Superior Sanitation Service, Inc*, 198 Mich App 499, 502; 499 NW2d 383 (1993). Moreover, appellants' contention that the PSC had to conduct a hearing is contrary to the mandate of § 202(c) that the PSC act "by order."

Appellants also contend that the PSC was merely authorized to prescribe the procedure and format for tariff filings. But on its face, § 202(c) is not so limited. Section 202(c) directs the PSC to order providers to "make available . . . and file" rate schedules. In contrast, the subsection immediately preceding expressly provides that the PSC, by or- der, shall establish the "manner and form" in which telecommunications providers keep books of accounts, records, and other matters. Section 202(b). If the Legislature had intended § 202(c) to be limited as suggested by appellants, the Legisla- ture could have drafted that section with language similar to that in § 202(b).

II

One of the areas in which regulation was retained is in the area of "basic local exchange service," as provided in §§ 301-309a of the act. In determining which specific services should be considered part of basic local exchange service, the PSC found that the intent of the Legislature was to regulate "only those local services that are primarily provided only by the LECs [local exchange companies] and that are essential to the public health, safety, or general welfare of most customers." The PSC further found that the definition of basic local exchange service "must be an evolving one" because of changing telecommunications technology. The PSC found that the Legislature intended that basic service not be limited merely to providing "a dial tone." The PSC's view of basic local exchange service was influenced by its understanding that the Legislature intended Act 179 to be a mechanism "to encourage the development of a modern, high-quality telecommunications infrastructure and to ensure that essential telecommunication services remain available and affordable to Michigan's residences, business, and schools."

This definition of "basic local exchange service" adopted by the PSC is far too expansive and is inconsistent with the language of Act 179. The Legislature expressly indicated that certain services must be provided, such as local directory assistance service, § 207; service for the hearing impaired, § 315; and lifeline service, § 316. Thus, for three specific services, the Legislature authorized the PSC to determine whether those services "are essential to the public health, safety, or general welfare and should be regulated" under Act 179. Section 207a. The Legislature precluded regulation of any telecommunications service not specifically provided for in the act. Section 401(2).

The expansive definition of "basic local exchange service" adopted by the PSC makes the Legislature's delineation of regulated services largely meaningless. The PSC has left itself with the power to include as regulated basic local exchange service any service provided by a local exchange company that the PSC deems essential to the "public health, safety or general welfare." If this were the standard, there would have been no need for the Legislature in § 207a to authorize the PSC to determine whether certain specific services should be regulated. Indeed, in § 207a the Legislature expressly authorized the PSC to make its determination on the basis of "public health, safety or general welfare." This standard is conspicuously absent in the definition of "basic local exchange service" provided by the Legislature.

The Legislature defined "basic local exchange service" in § 102(b) as

> the provision of an access line and usage within a local calling area for the transmission of high-quality 2-way interactive switched voice or data communication. [MCL 484.2102(b); MSA 22.1469(102)(b).]

This is the definition pursuant to which the PSC has been authorized to regulate. While there may be some leeway for interpretation, it is evident in light of this language and language specifically granting authority to regulate in some instances and expressly denying authority to regulate in all other instances, that basic local exchange service must be *basic.* A minimal view of "basic local exchange service" is also consistent with § 316(1), which requires a subsidized rate for "residential basic local exchange service" for certain low-income customers. We do not attribute to the Legis-

lature an intent to subsidize as "basic" service an expansive or highly sophisticated bundle of services.

We do not decide whether "basic local exchange service" comprises merely an access line and dial tone. Given the record before us, we are not in a position to determine the precise limits of "basic local exchange service." Indeed, this determination is particularly suitable to the administrative judgment of the PSC. However, the determination reached by the PSC on December 22, 1992, is inconsistent with the express language of Act 179.

III

Section 312 of Act 179 gives the PSC some regulatory authority over toll service. The PSC determined that toll service constituted "any switched communication between local calling areas that is not provided over a dedicated access line and is not access. . . ." At least for purposes of this appeal, this definition is not meaningfully different than the definition of "toll service" provided in § 102(u) of the act:

> "Toll service" means the transmission of 2-way interactive switched communication between local calling areas. Toll services does not include individually negotiated contracts for similar telecommunication services or wide area telecommunications service. [MCL 484.2102(u); MSA 22.1469(102) (u).]

Toll service is essentially long-distance service, which is service between local calling areas. But, importantly, the statutory definition excludes, among other things, "wide area telecommunications service," which service is "2-way interactive

switched communication over a dedicated access line." MCL 484.2102(v); MSA 22.1469(102)(v).

We find no merit in the argument on appeal that the PSC defined "toll service" too broadly because toll service should be construed to mean only "basic" long-distance service. This argument posits that the Legislature must have intended to regulate only basic service that is available from a sole provider or that is used by small customers without bargaining power. It is pointed out that under the PSC's definition, regulated "toll service" can include optional and large-scale services available from many providers.

We find no support in Act 179 for limiting the regulation of "toll service" to only "basic" toll service. The statutory definition of toll service makes no distinction for "basic" service. It is evident that the Legislature understood the concept of "basic" service because it expressly provided for regulation of "*basic* local exchange service." Without a clear textual basis for doing so, we will not give the statute such a construction. *Allstate Ins Co v Dep't of Ins,* 195 Mich App 538, 546; 491 NW2d 616 (1992). To the extent any appellant or any provider believes its regulated toll service should not be regulated, an application may be made to the PSC to deregulate that service. MCL 484.2208; MSA 22.1469(208).

However, in one significant respect, the PSC did err in its determination of what constitutes "toll service." In considering the second sentence of § 102(u), the PSC concluded that individually negotiated contracts for "similar" telecommunications services, which are not included within the definition of "toll service," could not include regular toll service and were limited to "unique services or circumstances not otherwise available in other areas of the company's tariffs." This determination

was based on a concern that excluding individually negotiated contracts for regular toll service would undermine the price caps, geographic averaging requirements, and imputed access charge obligations set forth in §§ 311 and 312 of the act.

A straightforward reading of the definition of "toll service" in § 102(u), however, indicates that the PSC misconstrued the scope of what negotiated contracts are excluded from toll service. The definition of toll service makes no reference to the price caps, geographic averaging requirements or imputed access charge obligations established in §§ 311 and 312. While those sections suggest the Legislature's concern about the availability of service and the cross-subsidization of unregulated services, plainly the Legislature did not refer to those concerns in its definition of "toll service" and expressly removed from such definition all similar services that are provided pursuant to individually negotiated contracts.

Under the PSC's construction, few, if any, individually negotiated contracts for toll service or similar service would avoid regulation, a result inconsistent with the deregulatory thrust of Act 179 and with its express language. Indeed, the fallacy of the PSC's reasoning is indicated in its conclusion that only individual contracts for "unique" services or otherwise unavailable services would avoid regulation. This result is far removed from the Legislature's exclusion of "similar" telecommunications services.

It is argued that the PSC was correct because the Legislature's reference to "similar" telecommunications services excludes "regular" toll service as defined in the first sentence of § 102(u). This interpretation of the word "similar" is erroneous because it is strained and does not result in a reasonable construction in light of the deregulatory na-

ture of the act. *Lorencz v Ford Motor Co,* 439 Mich 370, 376-377; 483 NW2d 844 (1992).

A plain reading of the definition of "toll service" suggests that, when the Legislature excluded individually negotiated contracts for "similar" services, the Legislature was excluding services having a general likeness to regular toll service, as well as regular or ordinary toll service. The word "similar" can mean something that resembles something else in many respects but is not identical, but it can also mean something that is exactly alike or identical. See Black's Law Dictionary (rev 4th ed). Dictionary definitions of a word can provide guidance in interpreting a word not defined in a statute. *Gordon v Allstate Ins Co,* 197 Mich App 609, 616; 496 NW2d 357 (1992). In *White v Ann Arbor,* 406 Mich 554, 572; 281 NW2d 283 (1979), the Court recognized (although it did not find on the facts before it) that "similar" may mean identical or exactly alike.

The psc's understanding would be incongruous. Under its approach, the psc could regulate those services that are most within the deregulatory contemplation of the Legislature, while enabling the deregulation of services that, if anything, are less certainly within the contemplated scope of deregulation.

In this case, defining "similar" services in the second sentence of § 102(u) to exclude ordinary or regular toll services is inconsistent with the express intent to remove individually negotiated contracts for certain services from regulation. Excluding regular or ordinary toll service from "similar" services would eliminate much of the purpose served by the second sentence of § 102(u).

Finally, we note that the psc's concern about the effect on rates for customers who do not have the benefit of an individually negotiated contract is

allayed by the PSC's authority to ensure that basic local exchange rates are "just and reasonable." MCL 484.2304(4); MSA 22.1469(304)(4).

IV

The PSC determined that the Legislature intended the continued regulation of "access services provided to all providers and customers." The PSC found it necessary to define "access services" because that specific phrase is not defined in Act 179. While recognizing that a telecommunications service is not "access service" unless it offers a connection to a local exchange network for the purpose of originating or terminating telecommunications service within the exchange, the PSC defined "access services" as "services and facilities provided to enable all providers and customers to originate or terminate any intrastate telecommunication."

We conclude that the PSC has again adopted an overly broad definition. Act 179 provides a definition for "access" in § 102(a):

"Access" means the provision of access to a local exchange network for the purpose of enabling a provider to originate or terminate telecommunications service within the exchange. [MCL 484.2102(a); MSA 22.1469(102)(a).]

This definition plainly provides that, in order for a telecommunications service to be "access," the service must (1) provide a connection to a local exchange network, (2) provide such a connection to enable the origination or termination of a telecommunications service within the local exchange network, and (3) provide the access service to a "provider." "Provider" is defined in § 102(s) as "a person who for compensation provides telecommunica-

tion services" or unregulated services described in § 401 of the act.

The Legislature used "access" and "access services" interchangeably in Act 179, and consequently there was no need for the PSC to establish a special definition for "access service." The definition of "access" in § 102(a) is drafted in terms of "the provision" of access. The manner in which "access" is provided is through some type of service. Article 3, part B of the act is entitled "access service." Section 310(8) is drafted in terms of a provider of "access" being required to offer "such services. . . ."

The PSC's definition of "access service" is erroneous to the extent that it departs from the definition of "access" provided by the Legislature. The PSC's definition erroneously encompasses "customers," as well as "providers," because § 102(a) defines access as a service provided to "a provider" and does not mention "customers." This is a meaningful distinction because "provider" is a word that has a specific meaning in the act. Section 102(s). Moreover, in defining "special access" in § 102(r), a definition that parallels the definition of "access" in all but one respect, the Legislature again referred to a service for "a provider" and did not mention "customers."

In arriving at its definition of "access service," the PSC was influenced by language in § 310(8) that requires a provider of access services to offer such services on a nondiscriminatory basis to "all providers and customers." Section 310(8) contains a similar requirement for special access services, mandating that they be offered to "all providers and customers." The PSC reasoned that any definition of access service must take into account "customers" as well as "providers."

The apparent purpose of § 310(8), however, is to

prohibit unreasonable discrimination in providing access services. For purposes of these appeals, we need not determine what circumstances the Legislature contemplated in requiring that providers and customers be treated equally in purchasing access services. It is clear that § 310(8) is not a definitional section. The Legislature expressly defined "access" in § 102(a). An element of that definition is that "access services" be established to enable a *provider* to originate or terminate telecommunication service within a local exchange network. The PSC erred in departing from the statutory definition. This conclusion is further supported by the Conference Committee Report on SB 124, which analyzed the bill that became 1991 PA 179. The report refers to "access service" as service provided "to long distance companies and other providers."

In arriving at its definition of "access service," the PSC also erroneously construed § 310(3) of the act. Section 310(3) provides that the rates for "access services" set by a provider thereof shall not exceed the rates "allowed for the same interstate services by the federal government . . . ." The PSC reasoned that this language demonstrated a legislative intent that the PSC regulate any intrastate "access service" for which there was an equivalent interstate service regulated by federal authorities. The PSC read too much into § 310(3). The provision is merely a cap on rates, carefully applied to the "same" interstate services. There is no indication in § 310(3) that the Legislature intended that all regulated interstate services would also be regulated intrastate.

We also find nothing in Act 179 to support the PSC's conclusion that the "transmission component" of certain otherwise unregulated services remains regulated because the transmission com-

ponent constitutes "access service." The PSC found that even though video and financial services networks were expressly listed in § 401(1) as unregulated services, the Legislature intended only to deregulate the "content" of the services, leaving the "transmission component" of the services regulated.

Again we can find no support for the distinction drawn by the PSC. The act does not divide services into transmission and content components. Section 401(1) is a clear statement that the PSC has no authority over the services specifically listed in that section. When a statute's meaning is clear, construction of that statute is neither necessary nor permitted. *Montgomery Ward & Co, Inc v Dep't of Treasury,* 191 Mich App 674, 679; 478 NW2d 745 (1991). Indeed, the PSC's conclusion is the direct opposite of that intended by the Legislature because the Legislature, in § 501 of the act, preserved some authority to control harmful "content" in any telecommunications service.

Closely related to the PSC's determination regarding access service is its determination regarding "special access." "Special access" is defined in § 102(r):

> "Special access" means the provision of access, other than switched access, to a local exchange network for the purpose of enabling a provider to originate or terminate telecommunication service within the exchange, *including the use of local private lines.* [MCL 484.2102(r); MSA 22.1469(202) (r). Emphasis added.]

On the basis of the reference to "local private lines" in the final clause of § 102(r), the PSC determined that all local private lines come within the definition of special access and are subject to regulation.

A straightforward reading of § 102(r) shows that the Legislature added the clause about local private lines only to make it clear that such lines could constitute "special access." The rest of the definition of "special access" must still be satisfied, and that definition requires the provision of nonswitched access to a local exchange network. To the extent private lines do not provide such access, they cannot be regulated as "special access."

V

The regulation of "new services" was briefly discussed by the PSC. The PSC concluded that the Legislature did not necessarily intend that any service would be unregulated just because it was introduced after January 1, 1992, and that variations in regulated services do not necessarily remove those services from regulation.

In Docket No. 163594, Michigan Bell Telephone Company argues that the PSC erroneously concluded that new variations of existing regulated services are automatically subject to regulation under Act 179.

Section 206(1) authorizes the PSC to regulate a "new telecommunication service" that is adverse to the public welfare or to the quality of basic local exchange service. Section 206(2) defines "new telecommunication service" as "a telecommunication service that is not available as of January 1, 1992."

The PSC's December 22, 1992, order that is before this Court pertains specifically to services that existed when Act 179 took effect. The PSC's discussion of new services was essentially a response to points raised by the parties in the proceeding before the PSC. We have not been shown that the

PSC's views regarding new services expressed in its December 22, 1992, opinion had a direct effect on the telecommunications services the PSC determined were regulated. We view the arguments raised in this Court regarding "new services" to be hypothetical or speculative and decline to consider them. *Blue Cross & Blue Shield of Michigan v Governor,* 422 Mich 1, 78; 367 NW2d 1 (1985); *Shavers v Attorney General,* 402 Mich 554, 588-589; 267 NW2d 72 (1978).

## VI

We conclude that the reasoning of the PSC, in significant respects, is inconsistent with the language of Act 179. In some respects, it is contrary to the express language of that statute, while in others it is contrary to the language of the statute when viewed as a logical whole. Such statutory language is the most authoritative evidence of the intentions of the drafters of the legislation. Although therefore it is unnecessary to parse the act in order to adduce these intentions, we are reinforced in our interpretations of Act 179 by its acknowledged overall deregulatory purpose. This purpose is better effected in each instance of controversy by the interpretation accorded by this Court's textual analysis than by the interpretations of the PSC itself.

With the exception of the filing procedures set forth by the PSC in Attachment A to their decision, the PSC's order of December 22, 1992, is vacated. This matter is remanded to the PSC for further consideration in light of this opinion.