HERRICK DISTRICT LIBRARY v LIBRARY OF MICHIGAN

Docket No. 300393. Submitted April 12, 2011, at Lansing. Decided
August 16, 2011, at 9:15 a.m.

The Herrick District Library brought an action in Ottawa Circuit
Court against the Library of Michigan and the Department of
Education (DOE), seeking a declaratory judgment that the DOE
lacked authority to promulgate Mich Admin Code, R 397.03(d) and
397.31(1)(b), and that they violated Michigan law. The challenged
rules required that in order to receive state aid, a public library
must provide equal library services to the total population residing
within an area designated for and served by a public library,
regardless of whether that individual resides in the library's
jurisdictional area (the boundaries within which electors can vote
on a library millage) or a contractual service area outside the
library's jurisdiction. Herrick argued that the rules would force
citizens who pay taxes for their local public library to give identical
services to people who do not. The court, Calvin L. Bosman, J.,
granted summary disposition in favor of Herrick, concluding that
the DOE lacked authority to promulgate the rules because it did
not have a clear and express statutory mandate to do so. The court
rejected the DOE and Library of Michigan's argument that the
power of an administrative agency to promulgate administrative
rules may be derived by inference from the agency's enabling
statute. The DOE and the Library of Michigan appealed.

The Court of Appeals *held*:

1. An administrative agency's powers are limited to those
expressly granted by the Legislature by clear and unmistakable
statutory language. The powers specifically granted to an agency
are strictly interpreted. Although an agency may have implied
powers, they are limited to those that are necessary to the due and
efficient exercise of the powers expressly granted by the enabling
statute. This allows the Legislature to delegate some degree of
authority to an administrative agency, but ensures that an agency
does not expand its powers beyond those that the Legislature
intended. The State Aid to Public Libraries Act, MCL 397.551 *et
seq.*, did not expressly grant the DOE power to promulgate new
rules and regulations controlling the distribution of state aid to

public libraries. The challenged rules were not necessary for the due and efficient exercise of the act; MCL 397.567 mandates only that cooperative and public libraries conform to certification requirements for personnel in order to receive money from the state. The enabling statute does not grant the DOE implied authority to promulgate new rules and regulations controlling additional eligibility requirements for the distribution of state aid to libraries. Accordingly, the DOE had neither express nor implied rulemaking authority to promulgate the challenged rules.

2. Const 1963, art 8, § 9 does not entitle nonresidents who do not contribute support to a library to library privileges identical to those of the taxpayers of the community who do. Local public libraries have the option to provide different services to residents and nonresidents. The challenged rules force citizens who pay taxes for their local public library to give identical services to people who do not, which is contrary to the intent of the drafters of the 1963 Michigan Constitution as interpreted by the Supreme Court in *Goldstone v Bloomfield Twp Pub Library*, 479 Mich 554 (2007).

Affirmed.

ADMINISTRATIVE LAW — AGENCIES — RULEMAKING AUTHORITY — EXPRESS AND IMPLIED POWERS.

An administrative agency's powers are limited to those expressly granted by the Legislature by clear and unmistakable statutory language; powers specifically conferred to an agency are strictly interpreted; although an agency may have implied powers, they are limited to those that are necessary to the due and efficient exercise of the powers expressly granted by the enabling statute.

*Foster, Swift, Collins & Smith, P.C.* (by *Michael D. Homier* and *Laura J. Garlinghouse*), for the Herrick District Library.

*Bill Schuette*, Attorney General, *John J. Bursch*, Solicitor General, *David H. Goodkin*, Assistant Attorney General, for the Library of Michigan and the Department of Education.

Amici Curiae:

*Law Weathers* (by *Richard W. Butler, Jr.*, and *Crystal L. Morgan*), for the Lakeland Library Cooperative, the

Woodlands Library Cooperative, the White Pine Library Cooperative, and the Superiorland Library Cooperative.

*Dykema Gossett PLLC* (by *William J. Perrone* and *Courtney F. Kissel*) for the Ann Arbor District Library

Before: METER, P.J., and SAAD and WILDER, JJ.

SAAD, J.

### I. NATURE OF THE CASE

The Michigan Supreme Court recently addressed the issue of whether citizens who pay taxes to support their local library are obliged by the Michigan Constitution to provide identical services or library privileges to citizens of another jurisdiction who do not pay any taxes or fees for these library services. *Goldstone v Bloomfield Twp Pub Library*, 479 Mich 554; 737 NW2d 476 (2007). In unambiguously answering this question in the negative, our Supreme Court interpreted our Constitution's library provisions and constitutional history to say quite the opposite. That is, our Supreme Court held that the framers of Michigan's Constitution clearly expressed their intent that citizens whose tax dollars support their local public library should not have to provide these library services for free to people who do not contribute to the financial upkeep of the library.

Yet defendant Michigan Department of Education (DOE), by promulgating the rules at issue here, attempts to force by regulation the very result our Supreme Court says is contrary to the framers' intent and the Constitution's provisions concerning local control of libraries. The DOE's position is particularly untenable because it rationalizes its administrative overreach on the ground that the legislation regarding state funding

of libraries gives the DOE this power by implication, notwithstanding that the relevant legislation neither mentions nor hints at such an unprecedented and coercive objective.

For the reasons articulated herein, we agree with Herrick District Library, which challenges the authority of the DOE to promulgate these rules, and hold that the DOE has no authority, express or implied, to force this unprecedented result upon local public libraries by issuing rules that have no basis in the enabling legislation and that our Supreme Court has said run contrary to the letter of our Constitution and the clear intent of its framers.

Indeed, the powers of administrative agencies such as the DOE are limited to those expressly granted by the Legislature. And though an agency may have implied powers, our caselaw narrowly restricts such authority to that " 'necessary to the due and efficient exercise of the powers expressly granted' " by the enabling statute. *Ranke v Corp & Securities Comm*, 317 Mich 304, 309; 26 NW2d 898 (1947) quoting *California Drive-in Restaurant Ass'n v Clark*, 22 Cal 2d 287, 302; 140 P2d 657 (1943). The State Aid to Public Libraries Act (State Aid Act), MCL 397.551 *et seq.*, does not expressly grant the DOE the power to promulgate new rules and regulations for the distribution of state aid to public libraries. Nor does the legislation provide that additional eligibility requirements are necessary for the State Aid Act's administration. Accordingly, the DOE lacks the authority to promulgate the rules at issue in this case. If the Legislature had intended that the DOE be able to write new eligibility requirements, it would have included authorizing language in the State Aid Act.

Further, we reiterate that these challenged rules expressly repudiate and violate the intent of the draft-

ers of our state Constitution, as explained recently by the Supreme Court in *Goldstone*. Indeed, despite our Supreme Court's analysis of Michigan's Constitution and its rejection of the policy of providing the same services to all library patrons, regardless of their financial contribution to that library, this is exactly what the DOE seeks to accomplish by what it regards as its implied rulemaking authority. Because such a policy conflicts with our state Constitution as interpreted by *Goldstone*, it is indeed questionable whether even the Legislature would have the ability to enact such a statute. Thus, it strains credulity, at best, to suggest as the DOE does that an administrative agency has an implied power to do the same by issuing regulations. This effort by the DOE—which ignores the will of the drafters of our Constitution and the Michigan Supreme Court's recent interpretation of our state Constitution— illustrates why our courts have historically strictly constrained the implied authority of administrative agencies. Accordingly, we uphold the trial court's grant of summary disposition to plaintiff, the Herrick District Library.

## II. FACTS AND PROCEDURAL HISTORY

### A. HOW LIBRARIES ARE FUNDED AND HOW THEY OPERATE

Plaintiff, the Herrick District Library, is a public library located in Holland, Michigan. It was established pursuant to the District Library Establishment Act, MCL 397.171 *et seq.* Public libraries in Michigan provide services to individuals who live in one of two areas: (1) the library's jurisdictional service area and, if it chooses to create one, (2) the library's contractual service area. A jurisdictional service area encompasses the territory within a library's legal boundaries where the electors are authorized to vote on a library millage

and may be eligible to be library board members. A contractual service area is created by the library and a municipality outside the library's jurisdictional service area and provides residents of that municipality with some level of library services, typically for an agreed-upon fee. Michigan's Legislature has passed numerous statutes allowing these arrangements to promote the "establishment of a system in which communities with public libraries can enter into agreements with communities without public libraries in order to extend access to such libraries."[1] *Goldstone*, 479 Mich at 562. Also, district libraries, like Herrick, are expressly authorized to enter into library-service contracts with municipalities not located in the library's jurisdictional service area. MCL 397.182(g).

Though jurisdictional and contractual service areas are similar because both expand library access, the two arrangements entail different responsibilities for the residents of each respective area. Residents of a library's jurisdictional service area are always a library's prime financial benefactors—they pay the taxes that provide their local library its essential funding. Individuals who live in contractual service areas have no such financial obligation—they simply pay an agreed-upon amount to secure specific services outlined in the agreement.

Accordingly, residents of a contractual service area typically have different—and often less comprehensive—library privileges than those who live in the library's jurisdictional service area. Because they pay taxes to fund the library, residents in the jurisdictional service area are entitled to full library services. Individuals residing in the contractual service area may receive full library services

---

[1] For a listing of statutes permitting the use of contractual service areas, see *Goldstone*, 479 Mich at 562 nn 7 and 8.

or partial library services, depending on the level of services specified in the contract. In brief, residents in the jurisdictional service area pay taxes for their library, and people in the contractual service area pay for specific services according to the contract.[2]

Like many other libraries in Michigan, Herrick serves individuals living in its jurisdictional area and maintains outside-service contracts with outlying municipalities. In some cases, Herrick offers different library services to residents of the contractual service areas than those provided to residents of its district.

## B. STATE AID

To offer its patrons additional library services, Herrick belongs to the Lakeland Library Cooperative, a network of libraries in Western Michigan that agree to share books, periodicals and other media. As a member of a library cooperative, Herrick is eligible for state funding under the State Aid Act and has received state aid for some time.

The state-aid program is managed by defendant Library of Michigan, a subsidiary agency of the DOE.[3]

---

[2] For an example of the wide-ranging services offered to residents of contractual service areas, compare *Goldstone* with the case at bar. In *Goldstone*, Bloomfield Hills maintained a contract with Bloomfield Township Public Library that allowed city residents "full access to the library" for a fee, *Goldstone*, 479 Mich at 557, while, in contrast, the residents of Herrick's contractual service areas receive different services than those who live in Herrick's jurisdictional service area.

[3] The Library of Michigan was initially part of the Michigan Department of History, Arts and Libraries (HAL). As such, the State Aid Act mentions HAL as the department responsible for managing the library-aid program. In October 2009, HAL was abolished by Executive Order 2009-36. The organization's responsibilities—including authority over the Library of Michigan—were assumed by the DOE. HAL promulgated the rules at issue in this case before its abolition; DOE has now assumed the burden of defending them.

Section 17 of the State Aid Act requires that each "cooperative library and public library" conform to "certification requirements for *personnel* as established by [the Michigan Department of History, Arts and Libraries (HAL)] in order to qualify for state aid." MCL 397.567 (emphasis added). In 2009, HAL promulgated the rules challenged in this case (State Aid Rules), which aimed to create further, nonpersonnel related eligibility requirements for public libraries to receive state funds. These new requirements sparked a public outcry, as libraries across the state challenged the authority of HAL to involve itself in their day-to-day operations and force citizens who pay taxes for their local library to give identical services to people who do not.[4]

Two rules—3(d) and 31(1)(b)—were particularly controversial. Mich Admin Code, R 397.03(d) and 397.31(1)(b). Together, they require that, in order to receive state aid, a public library must provide equal library services to each individual within the library's "legal service area population." Rule 3(d) defines "legal service area population" as "the total population residing within an area designated for and served by a public library, including the jurisdictional area and any contractual service area." Mich Admin Code, R 397.03(d). In other words, under the changed rules, libraries must provide the same services to every individual they serve, regardless of whether that individual resides in the library's jurisdictional area or a contractual service area outside the library's jurisdiction.

These State Aid Rules, if upheld, would change the long-established framework for state aid and outside-

---

[4] During the public-comment period before HAL formally adopted the State Aid Rules, eight Michigan library cooperatives sent HAL a joint letter protesting the new regulations.

service contracts. Herrick's current outside-service contracts—which provide different library privileges depending on where an individual resides—are clearly valid under the current statutory framework and existing caselaw. But the DOE's rules would render such arrangements unacceptable for purposes of distributing state aid. Concerned that the new rules would deprive it of all state funding, Herrick filed a complaint against the Library of Michigan, HAL, and the DOE and sought a declaratory judgment in October 2009. It alleged that the State Aid Rules would deprive Herrick of all state funding if it refused to offer identical services to both residents of its district and residents of its contractual service areas. Herrick asked the trial court to hold that defendants do not have authority to promulgate the State Aid Rules and that the rules violate Michigan law.

The trial court ruled that defendants did not have the authority to promulgate the State Aid Rules because defendants did not have a clear and express statutory mandate to do so. The court rejected defendants' contention that the power of an administrative agency to promulgate administrative rules may be derived by inference from a statute or statutes governing an agency.

Defendants assert that administrative agencies can infer rulemaking authority from the express authorities granted to them by statute. Specifically, they say that an agency has an implied power to adopt rules that are necessary to exercise the power expressly granted to the agency. Thus, while defendants acknowledge that the State Aid Act does not grant them express rulemaking authority, they suggest it gives them implied rulemaking authority.

Plaintiff counters that the Legislature must expressly grant rulemaking authority to administrative

agencies—"a doubtful power does not exist"—and that agencies cannot extend their powers by inference. *Mason Co Civil Research Council v Mason Co*, 343 Mich 313, 326–327; 72 NW2d 292 (1955). Further, plaintiff states that even if agencies may infer rulemaking authority, the State Aid Act does not grant implied rulemaking authority to defendants, particularly for the rules in issue.

### III. ANALYSIS[5]

#### A. EXPRESS AND IMPLIED POWERS OF ADMINISTRATIVE AGENCIES

It is "one of the axioms of modern government[]" that a Legislature "may delegate to an administrative body the power to make rules and decide particular cases . . . ." *West Virginia ex rel Dyer v Sims*, 341 US 22, 30; 71 S Ct 557; 95 L Ed 713 (1951). If it were unable to delegate certain tasks to subsidiary state organizations, the Legislature would be consumed in endless rounds of debate on minutiae.[6] As such, the Legislature routinely

---

[5] We review de novo a trial court's decision on a motion for summary disposition. *King v Michigan*, 488 Mich 208, 212; 793 NW2d 673 (2010). When reviewing a motion brought under MCR 2.116(C)(10), we consider the pleadings, affidavits, depositions, admissions, and any other documentary evidence submitted by the parties in the light most favorable to the party opposing the motion. *Reed v Breton*, 475 Mich 531, 537; 718 NW2d 770 (2006). A motion for summary disposition under MCR 2.116(C)(10) may be granted, as here, when there is no genuine issue with respect to any material fact and the moving party is entitled to judgment as a matter of law. *Campbell v Dep't of Human Servs*, 286 Mich App 230, 235; 780 NW2d 586 (2009).

[6] See, for example, *Ranke*, 317 Mich at 309-310 (describing the inability of the Legislature to spend time engaged in the details of real-estate regulation, and thus the need to empower an administrative agency to do so, and stating that "[i]t would be quite impossible for the legislature to enumerate all the specific acts which would constitute dishonest or unfair dealing upon the part of those engaged in the sale of real estate"); see also *United States v Grimaud*, 220 US 506, 516; 31 S Ct 480; 55 L Ed 563 (1911)

empowers state agencies through statutes to perform certain governmental functions. *York v Detroit (After Remand)*, 438 Mich 744, 767; 475 NW2d 346 (1991).

This labor-saving compact, however, comes with great risks. Administrative agencies frequently exercise judicial, executive, and legislative powers.[7] This blending of governmental roles creates a tension within our system of governance, which specifically delineates different and separate tasks for the separate branches of government. Our federal and state constitutions "divide the governmental power into three branches." *J W Hampton, Jr, & Co v United States*, 276 US 394, 406; 48 S Ct 348; 72 L Ed 624 (1928). Each branch is intended to have its own specific role, and it is the duty of the Legislature to make legislation. This power "cannot be exercised by anyone other than [the Legislature], except in conjunction with the lawful exercise of executive or judicial power." *Mistretta v United States*, 488 US 361, 417; 109 S Ct 647; 102 L Ed 2d 714 (1989) (Scalia, J., dissenting).

(discussing the need for the Department of Agriculture—as opposed to Congress—to regulate animal grazing at a federal forest reserve, stating that "[i]n the nature of things it was impracticable for Congress to provide general regulations for these various and varying details of management"); *J W Hampton, Jr, & Co v United States*, 276 US 394, 407; 48 S Ct 348; 72 L Ed 624 (1928) (noting that although Congress is empowered to regulate "rates to be exacted by interstate carriers for the passenger and merchandise traffic," [t]he "rates to be fixed are myriad," and, accordingly, Congress must delegate the power to set rates— otherwise "it would be impossible [for Congress] to exercise the power at all").

[7] See 1 Pierce, Administrative Law, § 2.3 (5th ed), p 47 ("Agencies, both pure Executive Branch and independent, make legislative rules based on agency policy decisions virtually every day. Agencies of both types execute the laws in every conceivable sense of the word. Agencies also adjudicate far more disputes involving individual rights than all of the federal courts combined—a function that would seem to bear most comfortably the label 'judicial.' These powers routinely are combined in a single agency, and the same individuals—Cabinet Secretaries, Administrators, or Commissioners—are responsible for the agency's many functions.").

Accordingly, our cases carefully limit the powers of administrative agencies to ensure that they do not abuse or make baseless expansions of the limited powers delegated to them by the Legislature. Therefore, being creations of the Legislature, they are only allowed the powers that the Legislature chooses to delegate to them through statute. *York*, 438 Mich at 767. Administrative agencies have no common-law powers. *McKibbin v Mich Corp & Sec Comm*, 369 Mich 69, 82; 119 NW2d 557 (1963). The "legislature, within limits defined in the law, may confer authority on an administrative officer or board to make rules as to details, to find facts, and to exercise some discretion, in the administration of a statute." *Argo Oil Corp v Atwood*, 274 Mich 47, 52; 264 NW 285 (1935). The agency's authority to adopt rules (if it has any such authority) is usually found " 'in the statute creating the agency and vesting it with certain powers.' " *Clonlara, Inc v State Bd of Ed*, 442 Mich 230, 237; 501 NW2d 88 (1993), quoting Bienenfeld, Michigan Administrative Law (2d ed), ch 4, pp 18-19.

The powers of administrative agencies are thus inherently limited. Their authority must hew to the line drawn by the Legislature. Our Supreme Court has repeatedly stressed the importance of this limitation on administrative agencies, stating that " '[t]he power and authority to be exercised by boards or commissions must be conferred by clear and unmistakable language, since a doubtful power does not exist.' " *Mason*, 343 Mich at 326–327 (citation omitted).[8] Further, powers " 'specifically conferred' " on an agency " 'cannot be

---

[8] *See* also *Lake Isabella Dev, Inc v Village of Lake Isabella*, 259 Mich App 393, 401; 675 NW2d 40 (2003) (" '[A] statute that grants power to an administrative agency must be strictly construed and the administrative authority drawn from such statute must be granted plainly, because doubtful power does not exist.' "), quoting *In re Procedure & Format for*

extended by inference'; . . . no other or greater power was given than that specified." *Alcona Co v Wolverine Environmental Production, Inc*, 233 Mich App 238, 247; 590 NW2d 586 (1998), quoting *Eikhoff v Detroit Charter Comm*, 176 Mich 535, 540; 142 NW 746 (1913).

The general rule in Michigan, then, is that the power and authority of an agency must be conferred by clear and unmistakable statutory language. And if a statute does explicitly grant an agency a power, that power is subject to "strict interpretation." *Mason*, 343 Mich at 326. An administrative agency that acts outside its statutory boundaries usurps the role of the legislature. This type of administrative overreach of course conflicts with our federal and state constitutions, which specifically indicate that "in the actual administration of the government Congress or the Legislature should exercise the legislative power. . . ." *J W Hampton*, 276 US at 406. As such, the role of an administrative agency terminates wherever the Legislature chooses to end it. See *York*, 438 Mich at 767.

However, our Supreme Court has said in dicta that agencies may gain rulemaking power through statutory implication. For example, in *Coffman v State Bd of Examiners in Optometry*, the Court stated that an administrative agency's " 'powers are limited by the statutes creating them to those conferred expressly or by necessary or fair implication.' " *Coffman v State Bd of Examiners in Optometry*, 331 Mich 582, 590; 50 NW2d 322 (1951) (citation omitted). And in *Ghidotti v Barber* and *Clonlara*, the Court quoted Bienenfeld, Michigan Administrative Law (2d ed), ch 4, pp 18-19 with approval: " 'Rulemaking authority may . . . be inferred from other statutory authority granted to an

*Filing Tariffs Under the Mich Telecom Act*, 210 Mich App 533, 539; 534 NW2d 194 (1995).

agency.' " *Ghidotti v Barber*, 459 Mich 189, 202; 586 NW2d 883 (1998); *Clonlara*, 442 Mich at 237.

Defendants would argue that, *Coffman*, *Ghidotti*, and *Clonlara* are united by their suggestion that administrative agencies always possess implied rulemaking power. Yet the statements on implied rulemaking power from these cases share one other common aspect—they are all dicta.[9] Accordingly, defendants reliance on *Coffman*, *Ghidotti*, and *Clonlara* is misplaced. None of these cases created binding precedent that recognizes a rulemaking power in administrative agencies gained solely through statutory implication.

Defendants cite one case to support their position that an agency may have implied rulemaking power

---

[9] In *Coffman*, an enabling statute gave the State Board of Examiners in Optometry the power to promulgate rules and regulations governing the practice of optometry, particularly the qualifications required for an applicant to take the Michigan examination in optometry. *Coffman*, 331 Mich at 585-587. Under this express authority, the state board sought higher standards for would-be optometrists than the baseline rules already established by the Legislature. *Id.* at 588, 591. Because the Legislature expressly granted authority by statute to the agency, the Court's discussion of implied authority was irrelevant to the outcome of the case. *Id.* at 586–587.

Similarly, in *Ghidotti*, the Legislature expressly delegated authority to an administrative agency, rendering the Court's comments on implied authority unnecessary. *Ghidotti*, 459 Mich at 196–197, 202. The statute at issue gave the Friend of the Court Bureau license to develop a formula used to determine child-support and health-care obligations. *Id.* at 196–197. Thus, *Ghidotti* did not involve implied authority and the Court's comment that rulemaking power can be inferred from statutory authority granted to an administrative agency is dicta. *Id.* at 202.

As in this case, the *Clonlara* Court considered a set of compliance procedures published by the DOE. *Clonlara*, 442 Mich at 233–234. However, *Clonlara* addressed whether those DOE procedures were promulgated in accordance with the Administrative Procedures Act. *Id.* The Court explicitly noted that neither party claimed an implied rulemaking authority. *Id.* at 237 n 14. As in *Coffman* and *Ghidotti*, the Court's comments on implied rulemaking authority were unnecessary to the final outcome of the case.

conferred by statute: *Ranke*. In *Ranke*, the Michigan Corporation and Securities Commission suspended the plaintiff's real-estate brokerage license. *Ranke*, 317 Mich at 306-307. Ranke challenged the suspension, arguing that the securities commission did not have the power to make rules and regulations regarding the suspension of real-estate licenses. *Id.* at 308.

The enabling statute, however, enumerated "conditions under which licenses [could] be cancelled or revoked" by the commission, including "[a]ny other conduct whether of the same or a different character than hereinbefore specified, which constitutes dishonest or unfair dealing." *Id.* at 308-309. The Court explained that the language of the statute clearly intended the commission to exercise some discretion. It would be "quite impossible" for the Legislature to "enumerate all the specific acts which would constitute dishonest or unfair dealing upon the part of those engaged in the sale of real estate." *Id.* at 309-310. By mentioning "any other conduct" constituting "dishonest or unfair dealing," the Legislature purposely created an opening for the commission to determine what "other conduct" constituted "dishonest or unfair dealing." *Id.* at 308.

In other words, the securities commission had the implied authority to define other conduct that constituted "dishonest or unfair dealing." *Id.* The power of classifying certain behavior as "dishonest and unfair dealing" was a necessary element of the "due and efficient exercise of the powers expressly granted" to the securities commission by the enabling statute. *Id.* at 309. While affirming the securities commission's limited implied powers, the Court relied on a rule created by the California Supreme Court:

"It is true that an administrative agency may not, under
the guise of its rule-making power, abridge or enlarge its
authority or exceed the powers given to it by the statute,
the source of its power. * * * However, 'the authority of an
administrative board or officer, * * * to adopt reasonable
rules and regulations, *which are deemed necessary to the
due and efficient exercise of the powers expressly granted*
cannot be questioned. This authority is implied from the
power granted.' " [*Id.*, quoting *California Drive-in*, 22 Cal
2d at 302-303 (emphasis added).]

Accordingly, there is authority that Michigan admin-
istrative agencies can infer a degree of rulemaking
authority from an enabling statute. But an administra-
tive agency may do so only when that implied authority
is "necessary to the due and efficient exercise of the
powers expressly granted" by the enabling statute.
*Ranke*, 317 Mich at 309. This standard is a carefully
crafted compromise that allows the Legislature to del-
egate some degree of authority to administrative agen-
cies, but ensures that the an agency does not expand its
powers beyond those that the Legislature intended.

Defendants argue that the rulemaking authority to
promulgate the State Aid Rules may be inferred from
two sections of the State Aid Act, MCL 397.567 and
MCL 397.573.[10] These two sections do not give the DOE

---

[10] MCL 397.567 states: "A cooperative library and public library shall
conform to certification requirements for personnel as established by the
[DOE] in order to qualify for state aid." MCL 397.573 provides that the
DOE must consider the following "needs" when exercising its powers to
meet its responsibilities under the State Aid Act:

(a) Library facilities shall be provided to residents of the area
covered by a cooperative library without needless duplication of
facilities, resources, or expertise.

(b) Establishment of a local public library may be approved for
state aid purposes where local conditions require an additional
local public library.

the express power to formulate rules for eligibility to receive state aid. MCL 397.567 provides for one eligibility requirement for libraries to receive state aid: "certification requirements for personnel." It does not provide the DOE with express authority to promulgate additional eligibility requirements.

Nor do MCL 397.567 and MCL 397.573 grant the DOE implied rulemaking authority to promulgate rules that establish eligibility requirements for state aid to libraries. Such rules are not "necessary to the due and efficient exercise of [the DOE's] powers expressly granted" by the State Aid Act. *Ranke*, 317 Mich at 309. The State Aid Act does not say or imply that additional eligibility requirements for libraries receiving state funds are necessary for its administration.

The State Aid Act is also dissimilar from the law at issue in *Ranke*, in which the Court held that an administrative agency had an implied rulemaking power. The *Ranke* statute necessarily required the Michigan Corporation and Securities Commission to define "other conduct" constituting "dishonest and unfair dealing." *Id.* at 308-309. The State Aid Act, however, leaves no opening for the DOE—nowhere does it stipulate that the DOE can determine "other" eligibility requirements for state aid. Instead, it lists only one eligibility requirement in MCL 397.567, which mandates that libraries seeking state aid must meet the DOE's certi-

----

(c) Existing public libraries and new public libraries shall cooperate to provide adequate library services at a reasonable cost.

(d) Increased effort shall be made to provide residents the right to read, with added emphasis on areas which normally cannot provide those services.

(e) Local responsibility, initiative, and support for library service shall be recognized and respected when provision is made for adequate local and cooperative library service.

fication requirements for personnel. If the Legislature had intended the DOE to be able to write new eligibility requirements, it would have included some language to that effect in the State Aid Act. *Wolverine*, 233 Mich App at 247 (noting that the express mention of one thing in a statute implies the exclusion of other similar things). Accordingly, the DOE does not have express or implied rulemaking authority to promulgate the State Aid Rules at issue in this case.

### B. STATE AID RULES CONFLICT WITH CONSTITUTIONAL INTENT

The substance and purpose of the State Aid Rules that DOE seeks to issue and enforce is an equally compelling reason to reject defendant's position. In effect, the DOE's rules force any library receiving state funds to provide equal privileges to each person it serves. The DOE claims the implied authority to do so comes from the State Aid Act, passed by the Legislature. But the Legislature enacted the State Aid Act pursuant to article 8, § 9 of our state Constitution, which gives the Legislature an obligation to promote the establishment of public libraries. *Goldstone*, 479 Mich at 563. Moreover, importantly and dispositively, the drafters of article 8, § 9 sought to ensure that local public libraries would not be required to make the same services available to individuals outside their jurisdiction as they provide to residents within their jurisdiction. Indeed, the drafters used article 8, § 9 to prevent the Legislature from exercising exactly the power DOE now seeks to gain through implication. *Id.* at 559–560. As such, the State Aid Rules conflict with the intent of the state Constitution and are an attempt by the DOE to exercise a power never granted to it by the Legislature.

For more than a century, the Michigan Constitution has sought to promote library construction throughout

the state. *Goldstone*, 479 Mich at 559-560. To this end, the 1908 Constitution required that every community maintain a library. Const 1908, art 11, § 14. This policy was unrealistic and unsuccessful. See *Goldstone*, 479 Mich at 566. In 1962, at the time delegates met to draft the current constitution, only 7 percent of cities and townships in Michigan maintained a public library. *Id.* More than one million Michigan residents had no access to a public library. *Id.* at 566 n 11.

Recognizing the failure of this "1908" approach, the Committee on Education at the 1961–1962 Constitutional Convention emphasized a program of local control over library services, with each local library making "reasonable rules for the use and control of its books." 1 Official Record, Constitutional Convention 1961, p 822. Further, the committee encouraged local libraries to expand their services through "cooperation, consolidation, branches and bookmobiles," presumably on an as-needed basis through deals with other municipalities. *Id.*

The committee's desire to promote local control of libraries was echoed by the convention delegates, who were determined to avoid a constitutional provision that mandated that each individual library provide equal privileges to each Michigan resident—the very policy that the DOE advocates here by implication. Delegate Karl Leibrand, himself a trustee of Bay City's public library, stressed the need for libraries to offer different services to different citizens. *Id.* at 834. It would be an "undue burden" to require a library to offer the same services to a "tourist or traveling salesman" as it would to a permanent resident of the town in which the library was located. *Id.* Delegate Vera Andrus noted that this concern reflected the will of the people: "One of the first problems that came up was, people said, '*We*

*don't want to have to pay for our library and then have other people use it.'* We don't mean that by this language [the proposed draft of article 8, § 9]." *Id.* at 835 (emphasis added).[11]

The final wording of article 8, § 9 reflects these concerns and enshrines local control of library resources and privileges in Michigan law. It states:

> The legislature shall provide by law for the establishment and support of public libraries which shall be available to all residents of the state under regulations adopted by the governing bodies thereof. All fines assessed and collected in the several counties, townships and cities for any breach of the penal laws shall be exclusively applied to the support of such public libraries, and county law libraries as provided by law. [Const 1963, art 8, § 9.]

Delegate Alvin Bentley explained that the clause "adopted by the governing bodies thereof" was purposefully added by the Committee on Style and Drafting to expressly allow local regulation of library resources:

> [T]he intent of the committee on style and drafting would be that local governing bodies of these various public libraries would be able to pass reasonable regulations regarding the accessibility and the availability of their individual libraries to residents of the state; particularly, I suppose, in cases where the applicant for a book or a periodical was not an immediate resident of the locality. [2 Official Record, Constitutional Convention 1961, p 2561.]

---

[11] This concern—that nonresidents, who do not bear the financial burden of supporting libraries, will be allowed to use the library services of another community—is still prevalent throughout the state. See Steele, *Odds Stacked Against Libraries as Cities Feel Pinch,* Detroit News, March 26, 2011, p A1 (describing the resistance of Birmingham residents to allowing Troy residents to use Birmingham's library for free: " 'The residents of Birmingham have told us they don't want us giving away services,' said Baldwin library director Doug Koschik.").

Further, responding to Delegate Leibrand's concerns that libraries would be required to provide equal privileges to nonresidents at no cost, Delegate Andrus pointed out that the draft of article 8, § 9 used the word "available" instead of "free." 1 Official Record, Constitutional Convention 1961, p 835. Thus, the Constitution's word choice affords local libraries the freedom to enter into service contracts—which might provide different services to residents and nonresidents—at their choosing.

The Constitution and this constitutional history underscores two points regarding public libraries. First, the best way to encourage communities to build and maintain libraries is to place public libraries under local control. *Goldstone*, 479 Mich at 562. Second, local control of public libraries necessarily entails the possibility that, through service contracts or other mechanisms, libraries will offer different privileges to individuals depending on where they live and how much they pay for services. *Id.*

In *Goldstone*, our Supreme Court emphasized and endorsed both points. It rejected the claim of a nonresident plaintiff who, without paying for the service, sought equal privileges at another community's library. In other words, *Goldstone* held that a nonresident has no constitutional claim to gain library-subsidization rights from the taxpayers in another community. *Id.* at 569. And the Supreme Court reasoned that to hold otherwise creates no incentive for communities to build and maintain libraries. *Id.* at 564. Nor would communities have an incentive to "make improvements and new accessions" to existing libraries, as any additions would be "identically available to persons who had and who had not paid for them[.]" *Id.*

The message of *Goldstone* is clear: local control of libraries, and the different privileges it may entail, is

not only constitutionally permissible, but clearly reflects the intent of the delegates who drafted the current Constitution. The drafters believed it to be the best way to provide access to a library to the greatest number of Michigan citizens. And as *Goldstone* notes, this policy has largely achieved its aim: In 2007, less than 1/5 of 1 percent of the state population lacked library access—an enormous improvement from the 1 million Michigan residents who had no access to public libraries in 1963.[12] *Id.* at 565, 566 n 11.

Thus, the Legislature, which is presumed to know the meaning of our Constitution, explicitly afforded local public libraries a large degree of autonomy in their operations.[13] According to *Goldstone,* this independence—which gives libraries the option of providing different services to residents and nonresidents—was the policy preference of the drafters of our Constitution. See *id.* at 559–560. Therefore, any act by the Legislature requiring that libraries provide equal services to all individuals, regardless of where they live and their financial contribution, would be of dubious constitutionality. If the Legislature's authority to pass such a statute is highly questionable, then an administrative agency certainly cannot claim an implied ability to do so.

### IV. CONCLUSION

The DOE does not have an implied power to adopt rules to govern its distribution of state aid to public

---

[12] Specifically, less than 1/5 of 1 percent of the state population lacked library access "either directly through their communities or through a cooperative agreement." *Goldstone,* 479 Mich at 565.

[13] See *People v Cash*, 419 Mich 230, 241; 351 NW2d 822 (1984) ("[A] general rule of statutory construction is that the Legislature is 'presumed to know of and legislate in harmony with existing laws.' "), quoting *People v Harrison*, 194 Mich 363, 369; 160 NW 623 (1916).

libraries. In Michigan, administrative agencies only possess the powers expressly granted to them by the Legislature. And an agency is allowed implied powers only when such authority is "necessary to the due and efficient exercise of the powers expressly granted" by the enabling statute. *Ranke*, 317 Mich at 309. The DOE's State Aid Rules are unnecessary to the "due and efficient exercise" of its statutorily granted powers. As such, the DOE lacks the authority to promulgate the challenged rules. Further, the content of these rules runs contrary to the intent of the drafters of our state Constitution as interpreted by our Supreme Court in *Goldstone*.

Accordingly, the trial court properly awarded plaintiff, the Herrick District Library, summary disposition, and we affirm.

METER, P.J., and WILDER, J., concurred with SAAD, J.