*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* IMPLEMENTING PROVISIONS OF PUBLIC ACT 233 OF 2023.

MICHIGAN PUBLIC SERVICE COMMISSION,

        Appellee,

and

MICHIGAN ENERGY INNOVATION BUSINESS COUNCIL, INSTITUTE FOR ENERGY INNOVATION, CLEAN GRID ALLIANCE, and ADVANCED ENERGY UNITED,

        Intervening Appellees,

v

ALMER CHARTER TOWNSHIP, ARGENTINE TOWNSHIP, AUGUSTA CHARTER TOWNSHIP, BEAVER TOWNSHIP, BENGAL TOWNSHIP, BINGHAM TOWNSHIP, BLISSFIELD TOWNSHIP, BRIDGEHAMPTON TOWNSHIP, BROCKWAY TOWNSHIP, CASCADE CHARTER TOWNSHIP, CATO TOWNSHIP, CLINTON COUNTY, COHOCTAH TOWNSHIP, COLUMBIA TOWNSHIP, COLUMBUS TOWNSHIP, CONWAY TOWNSHIP, COOPER CHARTER TOWNSHIP, DALLAS TOWNSHIP, DEERFIELD TOWNSHIP, DENMARK TOWNSHIP, DOUGLASS TOWNSHIP, DUPLAIN TOWNSHIP, EAGLE TOWNSHIP, EASTON TOWNSHIP, ELLINGTON TOWNSHIP, ELMWOOD TOWNSHIP, ESCANABA TOWNSHIP, FRANKENLUST TOWNSHIP, FREMONT TOWNSHIP, GARDEN TOWNSHIP, GARFIELD

FOR PUBLICATION
May 07, 2026
1:20 PM

No. 373259
Public Service Commission
LC No. 00-021547

-1-

TOWNSHIP, GENOA TOWNSHIP, HANDY
TOWNSHIP, IDA TOWNSHIP, INGHAM
TOWNSHIP, IONIA COUNTY, IOSCO
TOWNSHIP, ISABELLA TOWNSHIP, JOYFIELD
TOWNSHIP, JUNIATA TOWNSHIP,
KAWKAWLIN TOWNSHIP, KEENE TOWNSHIP,
KIMBALL TOWNSHIP, LAKE TOWNSHIP,
LEROY TOWNSHIP, MARION TOWNSHIP,
MARION TOWNSHIP, MILAN TOWNSHIP,
MONITOR CHARTER TOWNSHIP, MONTAGUE
TOWNSHIP, MONTCALM TOWNSHIP, MOORE
TOWNSHIP, NORTH BRANCH TOWNSHIP,
OGDEN TOWNSHIP, ORLEANS TOWNSHIP,
RIGA TOWNSHIP, SANILAC COUNTY,
SCHOOLCRAFT COUNTY, SEVILLE
TOWNSHIP, SHIAWASSEE COUNTY, SIDNEY
TOWNSHIP, SPEAKER TOWNSHIP,
STOCKBRIDGE TOWNSHIP, SUMMERFIELD
TOWNSHIP, TUSCOLA COUNTY, TYRONE
TOWNSHIP, VENICE TOWNSHIP, WALES
TOWNSHIP, WATERLOO TOWNSHIP,
WATERTOWN TOWNSHIP, WHITE OAK
TOWNSHIP, WHITE RIVER TOWNSHIP,
WILLIAMS CHARTER TOWNSHIP, WORTH
TOWNSHIP, YORK CHARTER TOWNSHIP, and
PARIS TOWNSHIP,

    Appellants.

---

Before: GADOLA, C.J., and MURRAY and M. J. KELLY, JJ.

MURRAY, J.

  Appellants, consisting of multiple townships and counties, appeal as of right an October 10, 2024 order of the Michigan Public Service Commission (PSC or Commission). The PSC's order implemented provisions of 2023 PA 233, which prescribes the powers and duties of the PSC to provide certification for the construction of certain wind, solar, and energy storage facilities. On appeal, appellants argue that the PSC exceeded its authority under PA 233 by redefining statutory terms, creating a new category of facilities, modifying statutory timelines, and implementing a rule in derogation of the law. We hold that (1) the PSC incorrectly interpreted PA 233 with respect to a statutory timeline, (2) the PSC improperly expanded the statutory definition of an affected local unit (ALU), but did not otherwise err in its interpretations of PA 233, and (3) the rulemaking requirements within the Administrative Procedures Act of 1969 (APA), MCL 24.201 *et seq*., do not apply to the PSC's order. We therefore affirm in part, and reverse in part, the PSC's order.

## I. BACKGROUND

### A. 2023 PA 233

PA 233 took effect on November 29, 2024, and added a new Part 8 to the Clean and Renewable Energy and Energy Waste Reduction Act, MCL 460.1001 *et seq*. PA 233 prescribes the powers and duties of the PSC to provide certification for the construction of wind, solar, and energy storage facilities. MCL 460.1222(2), which is part of the new Part 8 added by PA 233, provides that "[b]efore beginning construction of an energy facility, an electric provider or independent power producer may, pursuant to this part, obtain a certificate for that energy facility from the commission." The parties agree that the statute does not require a developer[1] to seek certification from the PSC in order to site an energy facility. Rather, a developer may instead choose to seek zoning approval from a local unit of government.

The new Part 8 added by PA 233 applies to "[a]ny solar energy facility with a nameplate capacity of 50 megawatts or more," MCL 460.1222(1)(a), "[a]ny wind energy facility with a nameplate capacity of 100 megawatts or more," MCL 460.1222(1)(b), and "[a]ny energy storage facility with a nameplate capacity of 50 megawatts or more and an energy discharge capability of 200 megawatt hours or more," MCL 460.1222(1)(c). Pertinent to determining whether the PSC has authority to approve such facilities is whether a local unit of government lacks a "compatible renewable energy ordinance" (CREO), which is statutorily defined as:

> an ordinance that provides for the development of energy facilities within the local unit of government, the requirements of which are no more restrictive than the provisions included in section 226(8). A local unit of government is considered not to have a compatible renewable energy ordinance if it has a moratorium on the development of energy facilities in effect within its jurisdiction. [MCL 460.1221(f).]

An ALU "means a unit of local government in which all or part of a proposed energy facility will be located," MCL 460.1221(a), while " 'Local unit of government' or 'local unit' means a county, township, city, or village," MCL 460.1221(n).

Under MCL 460.1223(1), "[a]n electric provider or independent power producer that, at its option or as required by the commission, proposes to obtain a certificate for and construct an energy facility shall hold a public meeting in each affected local unit." At least 30 days before such a public meeting, the developer must notify an ALU's clerk regarding the time, date, location, and purpose of the public meeting and provide a copy of the site plan or the internet address at which the site plan is available. *Id*. The developer also must publish notice of the public meeting in a local newspaper or digital alternative at least 14 days before the public meeting. *Id*.

At least 60 days before the public meeting, the developer must offer in writing to meet with the chief elected official of each ALU, or the chief elected official's designee, to discuss the site

---

[1] Like the parties, we use "developer" to refer to an electric provider or independent power producer.

plan. MCL 460.1223(2). If such a meeting occurs, and the chief elected official of each ALU notifies the developer within 30 days following such a meeting that the ALU has a CREO, the developer generally must seek approval of the facility from that ALU. MCL 460.1223(3). An ALU must approve or deny the developer's application within 120 days, although the developer and the ALU may jointly agree to extend the deadline by up to another 120 days. MCL 460.1223(3)(b).

Even if an ALU has a CREO, a developer may seek certification from the PSC if: (1) an ALU fails to timely approve or deny the developer's application; (2) the application complies with the requirements of MCL 460.1226(8) but an ALU denies the application; or (3) an ALU amends its zoning ordinance after notifying the developer that the ALU has a CREO and "the amendment imposes additional requirements on the development of energy facilities that are more restrictive than those in [MCL 460.1226(8)]." MCL 460.1223(3)(c). If the PSC approves a developer's application in one of the circumstances listed in MCL 460.1223(3)(c), then the ALU is no longer considered to have a CREO unless the PSC finds that the ALU's denial was reasonably related to the developer's failure to provide statutorily required information. MCL 460.1223(5).

"A site plan required under [MCL 460.1223 or 460.1225] shall meet application filing requirements established by commission rule or order to maintain consistency between applications." MCL 460.1224(1). Upon filing an application in the PSC, the developer is required to

> provide notice of the opportunity to comment on the application in a form and manner prescribed by the commission. The notice shall be published in a newspaper of general circulation in each affected local unit or a comparable digital alternative. [MCL 460.1226(2).]

In addition to certain statutorily required language for the notice, the PSC is given authority to "further prescribe the format and contents of the notice." *Id*.

The PSC is required to "conduct a proceeding on the application for a certificate as a contested case under the administrative procedures act of 1969, 1969 PA 306, MCL 24.201 to 24.328." MCL 460.1226(3). The PSC "shall grant the application and issue a certificate or deny the application not later than 1 year after a complete application is filed." MCL 460.1226(5). In evaluating the application, the PSC is required to consider feasible alternative developed locations if the proposed site is on undeveloped land, as well as the effect of the proposed facility on local land use, including the percentage of land dedicated to energy generation. MCL 460.1226(6). The PSC must also consider whether the proposed facility meets certain enumerated standards to ensure it does not pose an unreasonable threat to public health or safety. MCL 460.1226(7)(g) and (8).

MCL 460.1230(1) provides that, "[i]n administering this part, the commission has only those powers and duties granted to the commission under this part," with the Legislature specifying that "[t]his part shall control in any conflict between this part and any other law of this state. However, the electric transmission line certification act, 1995 PA 30, MCL 460.561 to 460.575, controls in any conflict with this part," MCL 460.1230(3). Further, "[i]f a certificate is issued, the certificate and this part preempt a local policy, practice, regulation, rule, or other ordinance that prohibits, regulates, or imposes additional or more restrictive requirements than those specified in

-4-

the commission's certificate." MCL 460.1231(3). However, a developer is not exempt from obtaining any other legally required license or permit regarding the construction or operation of an energy facility. MCL 460.1231(5).

Other statutes may also impact an application. For example, the Michigan Zoning Enabling Act (MZEA), MCL 125.3101 *et seq*., provides that "[e]xcept as otherwise provided under this act, a township that has enacted a zoning ordinance under this act is not subject to an ordinance, rule, or regulation adopted by a county under this act." MCL 125.3209. Also, 2023 PA 234, which was signed into law at the same time as PA 233, amended the MZEA to provide that a zoning ordinance is subject to "Part 8 of the clean and renewable energy and energy waste reduction act . . . ." MCL 125.3205(1)(d). In other words, PA 234 provides that zoning ordinances are subject to the new Part 8 added by PA 233.

## B. PSC ORDER

The PSC opened a docket on its own motion to implement PA 233, directing its staff to "engage with interested persons in transparent open meetings" and to "file recommendations on application filing instructions, guidance relating to compatible renewable energy ordinances, and any other issues in this docket by June 21, 2024." After holding eight public meetings, the PSC staff filed proposed application instructions and procedures on June 21, 2024.

On October 10, 2024, the PSC entered the challenged order. As relevant to this appeal, the PSC found "that a CREO under Act 233 means an ordinance that provides for the development of energy facilities within a local unit of government, the requirements of which are no more restrictive than the provisions included in Section 226(8)." The PSC elaborated "that a CREO may only contain the setback, fencing, height, sound, and other applicable requirements expressly outlined in Section 226(8) of Act 233 and may not contain additional requirements more restrictive than those specifically identified in that section."

The PSC further noted that PA 233 applies to solar energy facilities, wind energy facilities, and energy storage facilities having the respective capacities set forth in MCL 460.1222(1). In addition, the PSC approved the staff proposal "that hybrid energy facilities (i.e., energy facilities comprised of multiple technology types) should meet the statutory thresholds when multiple technologies are combined for siting," agreeing with its "interpretation of the applicability of Act 233 to hybrid facilities and [finding] that interpretation to be reasonable and supported by Act 233's plain language." The PSC reasoned "that the statutory definitions for both 'solar energy facility' and 'wind energy facility' expressly include 'energy storage facilities' as a part of these facilities, and therefore, contemplate that hybrid energy storage facilities may be included in the statutory thresholds for solar and wind projects."

Also noteworthy, according to the PSC, was that under the MZEA, "the zoning jurisdiction of a county does not include areas subject to a township zoning ordinance," and therefore it was viewed as "impossible for a county to have an applicable CREO if a township has enacted a CREO." Therefore, "the term ALU should be restricted to only those local units of government that exercise zoning jurisdiction." Additionally, "all the circumstances that trigger the Commission's limited authority to site energy facilities necessarily require a local unit of government to exercise zoning jurisdiction." According to the PSC, "although the statutory

-5-

definition of ALU does not reference zoning jurisdiction, reading the term in light of the entire context of Act 233's statutory scheme to provide a limited transfer of siting authority to the Commission reveals that such a restriction is not only reasonable, but necessary."  The PSC therefore concluded "that an ALU under Act 233 is limited to include only those local units of government that exercise zoning jurisdiction."

In addition, the PSC noted that because MCL 460.1223(3) requires a developer to follow a local siting process if the chief elected official of each ALU notifies the developer that the ALU has a CREO, the chief elected official of an ALU has an affirmative obligation to notify a developer of the existence of a CREO, and if the chief elected official fails to notify the developer of the existence of a CREO within 30 days after receiving an offer to meet, the developer may proceed as if the ALU does not have a CREO.

## II. ANALYSIS

Appellants argue that the PSC exceeded its authority under PA 233 by redefining statutory terms, creating a new category of facilities, and modifying statutory timelines.  Before we turn to the merits of those arguments, we first address the PSC's argument that the appeal is not ripe for our review.

## A. RIPENESS

"The doctrine of ripeness is designed to prevent the adjudication of hypothetical or contingent claims before an actual injury has been sustained." *King v Mich State Police Dep't*, 303 Mich App 162, 188; 841 NW2d 914 (2013) (quotation marks and citation omitted).  "A claim that rests on contingent future events is not ripe." *Id*.  In considering ripeness under a de novo standard of review, the timing of the action is a central focus. *Id*.; see also *Van Buren Charter Twp v Visteon Corp*, 319 Mich App 538, 553; 904 NW2d 192 (2017) ("The doctrine of ripeness . . . focuses on the timing of the action.") (quotation marks and citation omitted).  In fact, an issue may become ripe while the case is pending.  See *Taxpayers of Mich Against Casinos v Michigan*, 471 Mich 306, 333, 336; 685 NW2d 221 (2004) (opinion by CORRIGAN, C.J.) (remanding for review of an issue that became ripe after the case was last considered by the lower courts); but see *id*. at 349 (KELLY, J., concurring) (saying that Michigan law is unclear on this point and that "[f]ederal secondary authority suggests that a suit must be ripe when it is instituted[]").

A ripeness determination involves an assessment of "whether the harm asserted has matured sufficiently to warrant judicial intervention." *In re Reliability Plans of Electric Utilities for 2017-2021*, 325 Mich App 207, 218; 926 NW2d 584 (2018) (*In re Reliability Plans I*), rev'd on other grounds 505 Mich 97 (2020) (quotation marks and citation omitted).  "In making this assessment, this Court must balance any uncertainty about whether a party will actually suffer future injury against the potential hardship of denying anticipatory relief." *Id*.  An issue is ripe if the PSC made "a threshold determination, the resolution of which is not dependent on any further decision by the [PSC]." *Id*. (quotation marks and citation omitted).

The PSC takes the position that appellants have yet to suffer an injury, noting that PA 233 took effect on November 29, 2024, three weeks after this appeal was filed.  According to the PSC, as of February 7, 2025, no applications for siting certificates had been filed with it, and it has not

yet imposed on appellants any of the interpretations set forth in its October 10, 2024 order.[2]  For their part, appellants note that some of them have received written offers to meet from developers. The PSC responds that this does not establish that any application will necessarily be filed in the PSC, and that ALUs would have an opportunity to challenge the PSC's interpretations of PA 233 if and when a contested case proceeding takes place, including in any appeal from an order that is appealable under MCL 462.26(1).  The PSC thus opines that appellants' arguments are premised on contingent future events and are not at this juncture ripe.

*In re Reliability Plans I*, 325 Mich App at 217-220, addressed an analogous situation. There, the PSC and Consumers Energy Company argued that an issue regarding the imposition of a local clearing requirement was not ripe because the PSC had merely announced its authority to impose a local clearing requirement and had not yet imposed such a requirement on an individual alternative electric supplier.  *Id*. at 217.  In rejecting the ripeness challenge, this Court stated that the PSC had "not merely announced that it has the authority to impose a local clearing requirement on individual alternative electric suppliers; it has announced its decision to assert that authority, leaving open only the methodology of exercising that authority."  *Id*. at 218-219.  The PSC's decision constituted "a threshold determination ripe for our consideration given that the resolution of the issue is not dependent on any further decision by the [PSC]."  *Id*. at 219 (quotation marks and citation omitted).

Similar to *In re Reliability Plans I*, the PSC's order announced its interpretations of the statutory terms CREO and ALU, and set forth a new timeline within which an ALU must inform a developer that the ALU has a CREO.  The PSC also used a new term, "hybrid facility," that would allow certain types of facilities to be subject to PA 233.  The PSC's order was essentially a threshold determination that was not dependent on any further decision by the PSC.  Although the PSC will apply its interpretations to particular facts if and when any application for a siting certificate is filed, its order has already set forth interpretations with real-world implications, including what constitutes a CREO that would allow local siting in lieu of PSC siting, which local governmental entities qualify as ALUs and are entitled to statutory rights, what types of facilities fall within the ambit of PA 233, and the timeline within which an ALU must take certain actions. Even if no application for a siting certificate has been filed, the PSC's order has implications for the actions of ALUs that wish to utilize a local siting process to avoid an application for a siting certificate from proceeding in the PSC and the ability of certain local governmental entities to receive statutory benefits such as grant funds.  Because any uncertainty about whether appellants will actually suffer an injury is outweighed by the potential hardship of denying anticipatory relief, we conclude the matter is ripe for our review.  See *In re Reliability Plans I*, 325 Mich App at 218-219.

---

[2] At oral argument before this Court it was represented that there are at least 5 applications currently pending, though there was no substantiation of this.

B. THE PSC's INTERPRETATION OF THE STATUTE

We now turn to the merits of appellants' arguments which, again, are that the PSC exceeded its authority by redefining the statutory terms CREO and ALU, creating a new category of hybrid facilities, modifying statutory timelines, and failing to comply with the APA.

The PSC lacks common-law powers and "has only the authority granted to it by the Legislature." *In re Reliability Plans of Electric Utilities for 2017-2021*, 505 Mich 97, 119; 949 NW2d 73 (2020) (*In re Reliability Plans II*). The PSC "has the authority to interpret the statutes it administers and enforces," *id*, which includes PA 233. Of course, the PSC's statutory interpretations are subject to review de novo on appeal. *Id*. at 118-119. This Court respectfully considers the PSC's statutory interpretations, which will not be overturned in the absence of cogent reasons. *Id*. at 119.

> The primary goal of statutory interpretation is to give effect to the Legislature's intent. Statutory interpretation begins with examining the plain language of the statute. When that language is clear and unambiguous, no further judicial construction is required or permitted. [*Id*. (citations omitted).]

Importantly, a cogent reason exists for overturning an agency's statutory interpretation when that interpretation essentially rewrites the plain language of a statute. *Bonter v Progressive Marathon Ins Co*, ___ Mich ___, ___; 21 NW3d 908, 909 n 4 (2025), citing *In re Complaint of Rovas Against SBC Mich*, 482 Mich 90, 93; 754 NW2d 259 (2008).

1. CREO

With respect to appellants' argument that the PSC erred in its interpretation of the term CREO, the Legislature defined "CREO" as:

> an ordinance that provides for the development of energy facilities within the local unit of government, the requirements of which are no more restrictive than the provisions included in section 226(8). A local unit of government is considered not to have a compatible renewable energy ordinance if it has a moratorium on the development of energy facilities in effect within its jurisdiction. [MCL 460.1221(f)].

The PSC found "that a CREO under Act 233 means an ordinance that provides for the development of energy facilities within a local unit of government, the requirements of which are no more restrictive than the provisions included in Section 226(8)." More specifically, the PSC concluded "that a CREO may only contain the setback, fencing, height, sound, and other applicable requirements expressly outlined in Section 226(8) of Act 233 and may not contain additional requirements more restrictive than those specifically identified in that section."

The PSC's interpretation is consistent with the statutory language indicating that the requirements of a CREO must be "no more restrictive than the provisions included in section 226(8)." MCL 460.1221(f). Appellants suggest that a CREO may contain requirements in categories beyond those set forth in MCL 460.1226(8), as the limiting language within MCL 460.1221(f) only restricts ALUs from exceeding the actual requirements set forth in subsection 8,

such as a particular setback requirement, noise level, etc. In other words, the limiting language is not a restriction on what subjects can be part of a CREO, it only limits a CREO to imposing more restrictive requirements than those contained within the subjects actually addressed within subsection 8. Though this is not an unreasonable reading of MCL 460.1221(f), it is not the correct one. The addition of requirements not contained in MCL 460.1226(8) would inherently be more restrictive, and the Legislature has commanded that a CREO not be more restrictive. And as the PSC correctly noted, its interpretation is supported by other provisions.

For example, PA 233 identifies circumstances in which a developer may seek certification from the PSC even though the ALU has a CREO. Among those circumstances are when: (1) an ALU denies an application that complies with the requirements of MCL 460.1226(8); and (2) an ALU amends its zoning ordinance after notifying the developer that the ALU has a CREO and the amendment "imposes additional requirements on the development of energy facilities that are more restrictive than those in [MCL 460.1226(8)]." MCL 460.1223(3)(c)(*ii*) and (*iii*). The PSC reasoned that

> [t]he plain language of these provisions demonstrates that a CREO may only contain those requirements expressly outlined in Section 226(8) of Act 233. Had the Legislature intended to permit local units to include additional requirements beyond those identified in Section 226(8) of Act 233, it would not have restricted the Commission's authority to site energy facilities, in part, on the basis that a local unit denied an application for reasons beyond "the requirements of section 226(8)."

The PSC's analysis is sound. The fact that a developer may file an application in the PSC when an ALU denies an application that complies with the requirements of MCL 460.1226(8), or when an ALU amends its zoning ordinance to impose additional requirements more restrictive than those set forth in MCL 460.1226(8), supports the conclusion that a CREO may not contain additional requirements more restrictive than those identified in that statutory provision, including by adding categories of requirements not found in MCL 460.1226(8).

Noting that "PA 233, as PA 234 suggests, must be read in context with the MZEA," appellants reason that various provisions of the MZEA reflect that "[t]he Legislature knows how to limit local zoning authority," and there is no indication in PA 233, PA 234, or the MZEA that energy projects subject to PA 233 may be sited in any zoning district or any particular type of zoning district. As a result, appellants conclude that the PSC's definition of CREO is unduly narrow because "the Legislature expressed its intent that providers granted a certificate by the PSC must comply with local ordinances." MCL 460.1231(5).[3]

---

[3] MCL 460.1231(5) provides:

> Except as provided in this section, this part does not exempt an electric provider or IPP to whom a certificate is issued from obtaining any other permit, license, or permission to engage in the construction or operation of an energy facility that is required by federal law, any other law of this state, including, but not limited to, the natural resources and environmental protection act, 1994 PA 451,

We are not convinced. MCL 460.1231(5), upon which appellants rely, begins by indicating that it is applicable "[e]xcept as provided in [MCL 460.1231]." Notably, MCL 460.1231(3) provides, "If a certificate is issued, the certificate and this part preempt a local policy, practice, regulation, rule, or other ordinance that prohibits, regulates, or imposes additional or more restrictive requirements than those specified in the commission's certificate." Given the qualifying language at the beginning of MCL 460.1231(5), it is clear that MCL 460.1231(3) is controlling, and MCL 460.1231(3) preempts any local ordinance "that prohibits, regulates, or imposes additional or more restrictive requirements than those specified in the commission's certificate." This is consistent with how PA 233 treats the requirements in a CREO. See MCL 460.1221(f) and MCL 460.1226(8). In light of all this, we discern no merit in the argument that PA 233 does not limit local zoning authority, and therefore the PSC did not unduly narrow the definition of CREO.

In another avenue of challenge to the PSC's interpretation of the term CREO, appellants refer to MCL 460.1226(7)(g), which requires the PSC to grant an application and issue a siting certificate if it determines that "[t]he proposed energy facility does not present an unreasonable threat to public health or safety." Appellants observe that under MCL 460.1226(8), "[a]n energy facility meets the requirements of [MCL 460.1226(7)(g)] if it will comply with the" standards enumerated in MCL 460.1226(8). According to appellants, MCL 460.1226(8) merely defines what does not constitute "an unreasonable threat to public health or safety" under MCL 460.1226(7)(g), and that this is "only a small piece of the total information required by an application presented to the PSC." Continuing, appellants note that MCL 460.1223(3)(a) requires a developer's application filed with an ALU to contain information in addition to the requirements of MCL 460.1226(8), including some of the information required by MCL 460.1225(1). MCL 460.1223(3)(a) further provides that an ALU "may require other information necessary to determine compliance with the [CREO]."

But the fact that a developer must provide certain information to an ALU does not establish that the PSC erred in its interpretation of the term CREO. An ALU's entitlement to information does not alter the plain meaning of the statutory language defining a CREO. Appellants seem to suggest that an ALU should be allowed to deny an application on the basis of a developer's failure to provide information unrelated to the requirements of MCL 460.1226(8) and that an ordinance should not thereby lose its status as a CREO. But MCL 460.1223(3)(c)(*ii*) provides that a developer may file an application in the PSC if an ALU denies an application that complies with the requirements of MCL 460.1226(8). If the PSC approves the application and issues a certificate in that situation, the ALU would no longer be considered to have a CREO. MCL 460.1223(5). It is thus PA 233 itself, not the PSC's order, that leads to the result about which appellants complain.

In challenging the PSC's interpretation of the term CREO, appellants also rely on *In re Procedure & Format for Filing Tariffs Under Mich Telecom Act*, 210 Mich App 533, 548-550; 534 NW2d 194 (1995), where the PSC defined the phrase "access services" that was used in a telecommunications statute, *id*. at 548. Although the phrase "access services" was not statutorily defined, the term "access" was. *Id*. This Court stated that "[t]he Legislature used 'access' and

MCL 324.101 to 324.90106, any rule promulgated under a law of this state, or a local ordinance.

-10-

'access services' interchangeably in [the statute], and consequently there was no need for the PSC to establish a special definition for 'access service.' " *Id*. at 549. We held that "[t]he PSC's definition of 'access service' is erroneous to the extent that it departs from the definition of 'access' provided by the Legislature." *Id*. That holding has no relevance here, as the Legislature did not define a subcomponent of the term CREO and use that defined subcomponent interchangeably with the term CREO itself, and the PSC did not provide a definition of CREO that differed from the legislative definition. The PSC properly interpreted the term CREO in accordance with the statutory definition and the statute as a whole.[4]

Nor does *DeRuiter v Byron Twp*, 505 Mich 130; 949 NW2d 91 (2020), offer any help, as that case involved analysis of a form of implied preemption known as conflict preemption. *Id*. at 140. The *DeRuiter* Court considered whether a local zoning ordinance conflicted with provisions of the Michigan Medical Marihuana Act, MCL 333.26421 *et seq*., and was thus implicitly preempted. *DeRuiter*, 505 Mich at 134-135. The present issue does not involve implied preemption. *DeRuiter* thus has no relevance here. Appellants' reliance on *Consumers Power Co v Pub Serv Comm*, 460 Mich 148, 156; 596 NW2d 126 (1999), is also misplaced, as the PSC's interpretation of CREO was properly based on the statutory language and the statute as a whole, not on improper weighing of economic or policy factors.

## 2. ALU

We now turn to appellants' argument that the PSC erred in interpreting the term ALU to include only those units of local government that exercise zoning jurisdiction. To that point, PA 233 defines an ALU as "a unit of local government in which all or part of a proposed energy facility will be located." MCL 460.1221(a). " 'Local unit of government' or 'local unit' means a county, township, city, or village." MCL 460.1221(n). Thus, the Legislature provided a purely geographic definition of an ALU, as being an ALU depends exclusively on whether a proposed energy facility will be located (even in part) within a local unit of government's borders.

As we noted earlier, an agency cannot—just like a court cannot—rewrite the plain terms of a statute under the guise of statutory interpretation. For the primary task in enforcing a statute is to apply the plain meaning of statutory language, *People v Davis*, 337 Mich App 67, 78; 972 NW2d 304 (2021), and when doing so judicial construction is neither necessary nor permitted, *People v Gardner*, 482 Mich 41, 50; 753 NW2d 78 (2008). Of course, statutory provisions cannot be read in isolation, as the context in which the words are used is also important. *Honigman Miller Schwartz & Cohn LLP v Detroit*, 505 Mich 284, 307; 952 NW2d 358 (2020). Similarly, "[u]nder the doctrine [of *in pari materia*], statutes that relate to the same subject or that share a common

---

[4] The PSC did not admit that it adopted a narrower definition of CREO than that provided by the Legislature in PA 233, when it stated in the order that, "[w]ith respect to the competing viewpoints expressed in the comments, the Commission agrees that a narrow definition for a CREO is appropriate." Read in context, the PSC's remarks do not indicate that it was narrowing the legislative definition of CREO. Rather, the PSC used the term "narrow definition" in reference to the competing viewpoints expressed on this issue in the comments received by the PSC.

purpose should, if possible, be read together to create a harmonious body of law." *People v Mazur*, 497 Mich 302, 313; 872 NW2d 201 (2015).

The statutory definition of ALU is plain and unambiguous: it includes all local units of government where a proposed energy facility will be located. It does not refer to only those local units of government that have zoning jurisdiction; instead, when defining an ALU, the Legislature included within the definition *all* local units of government in which all or part of a proposed energy facility will be located. This definition is plain and unambiguous, requiring no interpretation. Quite simply, in crafting what jurisdictions will be entitled to a plethora of statutory rights under PA 233, the Legislature explicitly included all local units of government in which any part of an energy facility will be located. It is a straightforward and simple definition to apply.

This unambiguous definition also furthers several other provisions within PA 233. For example, an ALU—that is, a local unit of government where an energy facility is proposed to be located—is entitled to notice of public meetings so that affected residents can hear about, and comment upon, the proposal. MCL 460.1223(1) and MCL 460.1226(2). An ALU is also entitled to review and comment upon proposed projects that would, again, be located at least partially within its jurisdiction. See MCL 460.1224(2). Additionally, an ALU is provided a right to intervene in a contested case proceeding, MCL 460.1226(3), while potentially receiving a one-time grant of funds from the developer to cover costs associated with participating in that proceeding, MCL 460.1226(1). Another important statutory benefit for ALUs is the developer's obligation to enter into a host community agreement with each ALU, under which the developer must pay the ALU $2,000 for each megawatt of nameplate capacity located within the ALU, MCL 460.1227(1).[5] These statutorily granted rights and benefits are all geared to benefit localities where the energy facility is proposed to be located, consistent with the statutory definition tied to the geographic location of the energy facility. In other words, both the plain text of the statutory definition and its context requires the conclusion that an ALU is exactly what the Legislature said it was: a local unit of government in which all or part of a proposed energy facility is proposed to be located.

In reaching a different conclusion, the PSC focused its attention more on practicalities than the plain language of the statute. Rather than focusing on the plain language and context that we have just highlighted, the PSC placed more emphasis on whether a local unit had zoning jurisdiction, because only those jurisdictions can have a CREO and potentially have lawful input on the proposed energy facility through a CREO. See MCL 460.1223(3) (requires a developer to seek siting approval from each ALU if the chief elected official of each ALU timely notifies the developer that the ALU has a CREO).

---

[5] Appellants also note that the funds paid under a host community agreement are for "police-power purposes" and "have nothing to do with zoning." Appellants point to MCL 460.1227(1), correctly arguing that the payment under the host community agreement "shall be used as determined by the [ALU] for police, fire, public safety, or other infrastructure, or for other projects as agreed to by the local unit and the applicant," and that having zoning jurisdiction has no relation to whether a local unit of government may face potential emergency situations without the benefit of legislatively guaranteed funds.

Moreover, the PSC noted that PA 233 transfers siting authority to the PSC in four limited circumstances, and each involve a local unit that has zoning jurisdiction. Those four circumstances are: (1) "[a] local unit of government exercising zoning jurisdiction" asks the PSC to require a developer to obtain a certificate from the PSC, MCL 460.1222(2); (2) an ALU fails to timely approve or deny a developer's application under the local siting process, MCL 460.1223(3)(b), (c)(*i*); (3) a developer's application under the local siting process complies with the requirements of MCL 460.1226(8), but an ALU denies the application, MCL 460.1223(3)(c)(*ii*); and (4) an ALU amends its zoning ordinance after its chief elected official notifies the developer that the ALU has a CREO, "and the amendment imposes additional requirements on the development of energy facilities that are more restrictive than those in [MCL 460.1226(8)]," MCL 460.1223(3)(c)(*iii*). The PSC also quoted language from MCL 460.1221(f) stating that "[a] local unit of government is considered not to have a [CREO] if it has a moratorium on the development of energy facilities in effect within its jurisdiction."

The PSC determined "that all the circumstances that trigger *the Commission's* limited authority to site energy facilities necessarily require a local unit of government to exercise zoning jurisdiction," explaining that, "although the statutory definition of ALU does not reference zoning jurisdiction, reading the term in light of the entire context of Act 233's statutory scheme to provide a limited transfer of siting authority to the Commission reveals that such a restriction is not only reasonable, but necessary." Noting the commands of *Honigman Miller*, 505 Mich at 307, the PSC concluded "that an ALU under Act 233 is limited to include only those local units of government that exercise zoning jurisdiction." But focusing only on those local units of government that do have zoning jurisdiction and therefore may cause PSC involvement with energy facility approval, ignores the entire context of the statute. Indeed, the PSC's revised definition of ALU ignores (1) that the statute was not passed solely out of concern for the PSC, and (2) that there may be some local units of government where the proposed facility may be located, but that do not have zoning authority.[6] Through its broad definition the Legislature included local units of government with no zoning power as entities that are entitled to notice of public meetings, to provide comment on proposed facilities, and to intervene in contested cases involving a proposed facility that will be located within its boundary. Applying the straightforward and more broad definition of ALU provided by the Legislature, which is our public policy making branch of government, results in all affected local units of government having some involvement in the process of a proposed energy facility, which appears consistent with the intent of the Legislature. The PSC's more limited definition effectively re-writes the statutory definition of ALU, impedes the legislative policy choice to include all affected local units of government in at least part of the process, and cannot stand.

---

[6] A county's zoning jurisdiction does not include areas subject to a township zoning ordinance. See MCL 125.3209 and MCL 125.3102(x). Under these provisions it is impossible for a township and a county to each have a CREO in the same area.

-13-

## C. HYBRID FACILITIES

Appellants next argue that the PSC improperly added the term "hybrid facilities" to the list of energy facilities to which PA 233 applies, thereby inappropriately expanding its jurisdiction to include this new category of facilities.

As noted, PA 233 explicitly applies to solar energy facilities, wind energy facilities, and energy storage facilities having the respective capacities set forth in MCL 460.1222(1). The PSC concluded that its staff proposal "that hybrid energy facilities (i.e., energy facilities comprised of multiple technology types) should meet the statutory thresholds when multiple technologies are combined for siting," was reasonable and supported by Act 233's plain language. Citing MCL 460.1221(w) and (x),[7] the PSC observed "that the statutory definitions for both 'solar energy facility' and 'wind energy facility' expressly include 'energy storage facilities' as a part of these facilities, and therefore, contemplate that hybrid energy storage facilities may be included in the statutory thresholds for solar and wind projects."[8] In other words, although PA 233 itself does not use the term "hybrid energy facilities," the PSC's analysis was based on the statutory language, i.e., the PSC merely gave a name to a concept implicit in the statutory text.

Appellants' main challenge to the PSC planning for the existence of hybrid facilities is the absence of "a provision allowing solar and wind facilities to be combined." But at the same time appellants have not identified a reason why a facility comprised of multiple technology types (each of which are permitted by statute) may not fall within the PSC's jurisdiction under PA 233.

In an attempt to comply with the statutory energy capacities for each type of energy, the PSC provided that when multiple technology types are combined into a hybrid facility, the higher applicable capacity threshold is utilized to determine whether the PSC may assume jurisdiction. Consistent with the capacity threshold limits set forth in MCL 460.1222(1), the PSC's application filing instructions indicate that the 100-megawatt capacity threshold applies to any facility that includes wind technology and that the 50-megawatt capacity threshold applies to a facility that does not include wind technology. If, for example, a facility includes both wind and solar technologies, the higher capacity threshold applicable to wind technology will apply.

Appellants object to this method, suggesting that, by allowing multiple technology types to be used to meet the applicable capacity threshold, the PSC expanded its "authority over smaller projects that band together to avoid local zoning regulations." But appellants fail to articulate a reason why the relative proportion of each technology type may not be considered when determining whether the applicable capacity threshold has been satisfied. No basis exists to exclude part of a facility's capacity when assessing whether the capacity threshold is met. Overall,

---

[7] MCL 460.1221(w) defines "[s]olar energy facility" as including "energy storage facilities," and MCL 460.1221(x) defines "[w]ind energy facility" as including "energy storage facilities."

[8] Although not determinative, the PSC also noted that its interpretation of the applicability of Act 233 to hybrid facilities is consistent with the Michigan Department of Environment, Great Lakes, and Energy's eligibility requirements for the Renewables Ready Communities Award grant for hybrid facilities.

and in light of the statutory definitions, appellants fail to establish that the PSC erred with respect to the recognition of hybrid facilities.

## D. TIMELINE

Turning next to appellants' challenge to the PSC's timeline, we agree that the PSC incorrectly interpreted PA 233 with respect to a statutory timeline.

Under MCL 460.1223(1), a developer must hold a public meeting in each ALU in which the developer proposes to obtain a certificate for and construct an energy facility. At least 60 days before the public meeting, the developer must "offer in writing to meet with the chief elected official of each [ALU], or the chief elected official's designee, to discuss the site plan." MCL 460.1223(2). If, within 30 days following a meeting between the developer and the chief elected official or the chief elected official's designee, the chief elected official of each ALU notifies the developer that the ALU has a CREO, then the developer must file for siting approval with each ALU. MCL 460.1223(3). An ALU must approve or deny the application for siting approval within 120 days after receiving the application, although the ALU and the developer may jointly agree to extend the deadline by up to 120 days. MCL 460.1223(3)(b).

The PSC's order noted that, under MCL 460.1223(3), a developer is required to follow a local siting process only if the chief elected official of each ALU notifies the developer that the ALU has a CREO. The PSC then found that the chief elected official

> of an ALU has an affirmative obligation to notify [a developer] of the existence of a CREO, and if that [chief elected official] fails to notify the [developer] of the existence of a CREO within 30 days following receipt of an offer to meet, the [developer] may proceed as if an ALU does not have a CREO.

The PSC's timeline differs from that set forth in the statute. The PSC indicated that the chief elected official must notify the developer of the existence of a CREO within 30 days following the receipt of the offer to meet and that, absent such notification, the developer may proceed as if the ALU does not have a CREO. But under MCL 460.1223(3), the 30-day timeline begins not with the receipt of the offer to meet but with the actual meeting between the developer and the chief elected official or the official's designee. The statute indicates that the chief elected official has 30 days following the meeting itself to notify the developer of the existence of the CREO and that, if such notice is provided, the developer must file for approval with the ALU. The PSC thus incorrectly interpreted PA 233 with respect to the statutory timeline.

In their briefs on appeal, the PSC and intervening appellees express concern that an ALU could unreasonably delay meeting with a developer and thereby upend the entire PA 233 process. But our concern is what the statute requires, and MCL 460.1223(3) unambiguously provides that the 30-day timeline begins with the meeting itself. Unambiguous statutory language must be enforced as written, *In re Implementing Section 6w of 2016 PA 341 for Cloverland Electric Coop*, 329 Mich App 163, 177-178; 942 NW2d 38 (2019), and the PSC erred in implementing a timeline different than that required by law.

E. APA

For their final argument, appellants argue that the PSC's order is unlawful because it constitutes a rule that was not promulgated in compliance with the rulemaking requirements of the APA. This Court reviews de novo as a question of law whether an administrative policy is invalid because it was not promulgated as a rule under the APA. *Faircloth v Family Independence Agency*, 232 Mich App 391, 401; 591 NW2d 314 (1998).

Formal APA rulemaking is generally required when an agency establishes policies that "do not merely interpret or explain the statute or rules from which the agency derives its authority" but rather "establish the substantive standards implementing the program." *Faircloth*, 232 Mich App at 404. "The APA outlines a formal process that must be followed for an agency to promulgate a rule that has the force and effect of law." *O'Halloran v Secretary of State*, 515 Mich 606, 636; 29 NW3d 429 (2024).

Under the APA, a "rule" is defined, in pertinent part, as follows:

"Rule" means an agency regulation, statement, standard, policy, ruling, or instruction of general applicability that implements or applies law enforced or administered by the agency, or that prescribes the organization, procedure, or practice of the agency, including the amendment, suspension, or rescission of the law enforced or administered by the agency. Rule does not include any of the following:

* * *

(h) A form with instructions, an interpretive statement, a guideline, an informational pamphlet, or other material that in itself does not have the force and effect of law but is merely explanatory.

* * *

(j) A decision by an agency to exercise or not to exercise a permissive statutory power, although private rights or interests are affected. [MCL 24.207.]

Therefore, under MCL 24.207(h) and (j), an agency may interpret a statute or exercise a permissive statutory power without engaging in formal rulemaking.

"An executive agency's power derives from statute. Yet an agency has the authority to interpret the statutes it administers and enforces." *O'Halloran*, 515 Mich at 635-636 (citation omitted). The PSC thus "has the authority to interpret the statutes it administers and enforces." *In re Reliability Plans II*, 505 Mich at 119. "[A]n interpretive statement in itself lacks the force and effect of law because it is the underlying statute that determines how an entity must act, i.e., that alters the rights or imposes obligations." *O'Halloran*, 515 Mich at 637 (quotation marks and citation omitted). "[W]here an agency policy interprets or explains a statute or rule, the agency need not promulgate it as a rule even if it has a substantial effect on the rights of a class of people because an interpretive statement is not, by definition, a rule under the APA." *Faircloth*, 232 Mich App at 404. "Even if a regulated entity does not comply with the statement, the interpretive

-16-

statement does not bind an administrative law judge to sanction an entity in an enforcement action, nor does it bind a court on judicial review." *Mich Farm Bureau v Dep't of Environment, Great Lakes, & Energy*, 515 Mich 481, 524; 28 NW3d 629 (2024). Also, "statements explaining how an agency plans to exercise a discretionary power are usually considered to lack the force and effect of law." *Id*. "[S]tatements announcing a policy the agency plans to establish in future adjudications generally lack the force and effect of law." *Id*. at 526.

In the challenged order, the PSC provided interpretations of provisions of PA 233, including with respect to the statutory terms CREO and ALU and the concept of hybrid facilities. The fact that the PSC misinterpreted portions of the statute does not mean that the PSC enacted a rule subject to APA rulemaking requirements. "[A]n interpretive statement that goes beyond the scope of the law may be challenged when it is in issue in a judicial proceeding. An interpretation not supported by the enabling act is an invalid interpretation, not a rule." *O'Halloran*, 515 Mich at 637-638 (quotation marks and citation omitted). Through this order the PSC did not establish a regulation or policy having the force and effect of law. Rather, the PSC interpreted the relevant statutes, which did not require rulemaking.

The PSC also exercised a permissive statutory power under PA 233 by establishing application filing requirements by order. See MCL 460.1224(1) ("A site plan required under section 223 or 225 shall meet application filing requirements established by commission rule or order to maintain consistency between applications."). An agency's decision to exercise a permissive statutory power is also not a rule subject to APA rulemaking requirements. MCL 24.207(j); see also *Mich Trucking Ass'n v Mich Pub Serv Comm (On Remand)*, 225 Mich App 424, 430; 571 NW2d 734 (1997) (noting that a certain statute "directly and explicitly authorizes the PSC to implement, either by rule or order, a safety rating system for motor carriers" and thus holding that "[b]ecause the safety rating system is clearly an exercise of permissive statutory power, it is exempted from formal adoption and promulgation under the APA[]").

Appellants assert that the PSC could not proceed by order because no public hearing was held despite the general applicability of the order. Appellants cite MCL 24.232(6), which states:

> If a statute provides that an agency may proceed by rule-making or by order and an agency proceeds by order instead of rule-making, the agency shall not give the order general applicability to persons that were not parties to the proceeding or contested case before the issuance of the order, unless the order was issued after public notice and a public hearing.

The procedural history significantly undercuts appellants' position.

In its October order the PSC noted that its staff held eight public meetings regarding the implementation of PA 233, with the proposed application filing instructions and procedures being the culmination of the work following those eight public meetings and a review of informal public comments. Following the filing of the staff's proposed draft, more than 100 comments were submitted to the PSC, including comments from many stakeholders. The PSC and its staff considered all of the comments in developing the application filing requirements. In sum, the PSC engaged in both formal and informal public outreach, and did not unlawfully or unreasonably fail to comply with any applicable APA requirement.

Affirmed in part, reversed in part, and remanded for further proceedings. We do not retain jurisdiction. No costs to any party, the matter being of public significance.

/s/ Christopher M. Murray
/s/ Michael F. Gadola
/s/ Michael J. Kelly